UNION PACIFIC RESOURCES COMPA-
NY, a Delaware corporation, as Succes-
sor in Interest to Champlin Petroleum
Company, Appellant (Plaintiff),

v.

TEXACO, INC., a Delaware corporation;
and Wexpro Company, a Utah corpora-
tion, as Successor in Interest to Moun-
tain Fuel Supply Company, Appellees
(Defendants).

AMOCO PRODUCTION COMPANY, a
Delaware corporation, Appellant
(Plaintiff),

v.

TEXACO, INC., a Delaware corporation;
and Wexpro Company, a Utah corpora-
tion, as Successor in Interest to Moun-
tain Fuel Supply Company, Appellees
(Defendants).

Nos. 93–223, 93–224.

Supreme Court of Wyoming.

Sept. 30, 1994.

Rehearing Denied Nov. 2, 1994.

Loyd E. Smith of Lathrop & Rutledge, P.C., Cheyenne, and Gretchen A. Vander-Werf and Lino S. Lipinsky de Orlov of Hawley and VanderWerf, P.C., Denver, CO, for Union Pacific Resources Co.

Bradley S. McKim of Amoco Corp., Denver, CO and Stan L. Spangler of Shaw, Spangler & Roth, P.C., Denver, CO, for Amoco Production Co.

Neil J. Short, Casper, and Craig R. Carver of Gibson, Dunn & Crutcher, Denver, CO, for Texaco, Inc.

Neil J. Short, Casper, for Wexpro Co.

Before GOLDEN, C.J., and THOMAS, CARDINE,* MACY,** and TAYLOR, JJ.

TAYLOR, Justice.

The primary question in these consolidated appeals concerns the interpretation of a contract. The contract is an operating agreement formed by four oil and gas companies who own exclusive rights to exploit minerals on certain lands in Wyoming. The contract allocates expenses and profits for natural gas exploration and production. The allocation

* Retired July 6, 1994.

** Chief Justice at time of oral argument.

of profit varies depending upon the geologic formation from which production is achieved. After the parties executed the contract, a natural gas well capable of significant production was discovered in one formation. Subsequently, the Wyoming administrative agency responsible for oil and gas conservation ordered that the size of the drilling unit for that formation be enlarged from its former boundaries to protect the correlative rights of an adjoining mineral rights owner and the operating rights owners. This dispute is focused on whether the order from the administrative agency superseded the parties' contract. The district court determined that the contract was modified by the administrative agency order.

We affirm.

## I. ISSUES

Appellant, Union Pacific Resources Company (Union Pacific), identifies the issues in Appeal No. 93–223 as:

1. Whether the parties' Operating Agreement clearly and unambiguously fixed the parties' respective ownership interests in production from the L–2 Well.

2. Whether spacing and compulsory pooling orders entered by the Wyoming Oil and Gas Conservation Commission subsequent to the drilling of the L–2 Well modified or superseded the parties' private agreement regarding the allocation of production set forth in the Operating Agreement.

3. Whether the concept of correlative rights embodied in the Wyoming Oil and Gas Conservation Act, W.S. §§ 30–5–101, et seq., overrides a private agreement voluntarily entered into among working interest owners apportioning production among themselves.

4. Whether the District Court's finding that the Commission's orders modified the Operating Agreement unconstitutionally impaired UPRC's contractual relationship with Texaco and Wexpro.

5. Whether Texaco and Wexpro are estopped from claiming interests in the L–2 Well greater than they bargained for in the Operating Agreement.

Appellant, Amoco Production Company (Amoco), frames the following issues in Appeal No. 93–224:

1. Does a Wyoming Oil and Gas Conservation Commission order enlarging a drilling unit under W.S. § 30–5–109 in and of itself change working interest ownership as agreed to in a private operating agreement?

2. If the answer to Issue 1 is "No", should summary judgment be entered in Amoco's favor on the basis that the Operating Agreement unambiguously fixes the parties' working interest ownership?

Appellee, Wexpro Company (Wexpro), finds these issues in the consolidated cases:

1. Whether the statutory provisions of the Wyoming Conservation Law and the regulatory provisions of the Wyoming Oil and Gas Conservation Commission must be considered a part of oil and gas contracts for operations in the State of Wyoming as though these [statutory] and regulatory provisions were actually included in the terms of any such contract.

2. Whether the provisions of the subject Operating Agreement * * * incorporated into that Operating Agreement the spacing orders entered by the Wyoming Oil and Gas Conservation Commission in Docket No. 191–81 for the *Frontier* formation * * * and by the order entered in Docket No. 190–81 for the *Dakota* formation * * *.

3. Whether the findings of fact and conclusions of law entered by the Wyoming Oil and Gas Conservation Commission in Docket No. 404–90 * * * altered the subject Operating Agreement * * * as to the *Dakota* formation in order to honor the best, current scientific data and thereby protect the correlative [rights] of appellees Wexpro Company and Texaco, Inc.

4. Whether the Operating Agreement * * * is a pooling agreement.

Appellee, Texaco, Inc. (Texaco), summarizes the issues from both cases:

Whether the district court's Order properly interpreted the meaning of the parties' Operating Agreement.

## II. FACTS

On September 18, 1981, the Wyoming Oil and Gas Conservation Commission (Commission) issued two orders to regulate exploration for natural gas and associated hydrocarbons (gas) on certain Wyoming lands located in Lincoln, Sweetwater and Uinta Counties. The orders established drilling units of specified sizes where one well could be drilled to extract pools of gas that were believed to exist in distinct sedimentary formations beneath the surface. Each order also identified the area assigned for the granting of a well permit.

Included in the Commission's orders were sedimentary formations located in the Bruff Field of the Moxa Arch area of Sweetwater and Lincoln Counties. In the Frontier formation, the Commission established an irregularly sized 760-acre drilling unit which included all 640 acres of Section 15 and an adjoining 120-acre portion of Section 22 of Township 19 North, Range 112 West, 6th P.M. In the Dakota formation, the Commission established a 640-acre drilling unit which encompassed all of Section 15 of Township 19 North, Range 112 West, 6th P.M. The Dakota formation is a geologic zone which is found at a deeper depth than the Frontier formation.

Union Pacific, Amoco, Wexpro and Texaco (collectively the parties) own oil and gas working interests in the Bruff Field. Effective October 7, 1981, the parties, or their predecessors in interest, entered into an Operating Agreement to test and develop a portion of the Bruff Field. The Operating Agreement defined the "subject lands" as including the parties' interests in all of Section 15 of Township 19 North, Range 112 West, 6th P.M. (hereinafter Section 15) and the parties' interests in the portion of Section 22 of Township 19 North, Range 112 West, 6th P.M. (hereinafter Section 22) which corresponded with the Commission's Frontier formation drilling unit order. The Operating Agreement acknowledged that the Commission had established a 760-acre drilling unit for the Frontier formation and a 640-acre drilling unit for the Dakota formation. Specifically incorporated into the Operating Agreement was an agreement of Operating

Provisions which was attached as Exhibit "D". The Operating Agreement also incorporated another agreement signed by the parties which is styled as a Communitization Agreement. Effective October 7, 1981, the Communitization Agreement provided exclusively for development of the Frontier formation.

The Operating Agreement designated Amoco as the operator of the wells on the "subject lands." During 1981, Amoco was required to commence drilling of a test well in Section 15 "to adequately test the Frontier and Dakota formations" unless conditions prohibited. This test well, designated the Champlin 149 Amoco "L" Well # 1 (hereinafter the L-1 Well) was located in the southeastern quarter of Section 15. The L-1 Well produced commercial quantities of gas from the Frontier formation, but was unproductive from the Dakota formation. On April 30, 1982, the L-1 Well was placed in commercial production.

In the Operating Agreement, the parties agreed to allocate the ownership of production in "working interest percentages," which were stated as:

| | Frontier | Dakota |
|------------------|------------|------------|
| [Wexpro] | 15.62501% | 11.04410% |
| Amoco | 46.71052% | 53.95750% |
| [Union Pacific] | 21.87500% | 29.00420% |
| Texaco | 15.78947% | 5.99420% |

Production from the L-1 Well was allocated according to these "working interest percentages" for the Frontier formation.

On June 29, 1989, Amoco proposed drilling the Champlin 149 Amoco "L" Well # 2 (hereinafter the L-2 Well). The L-2 Well would be located within the southwestern quarter of Section 15 and would be drilled to test both the Frontier and Dakota formations. Union Pacific, Wexpro and Texaco all signed "Well Authorization" agreements to signify their approval of the proposal. These agreements restated that production from the L-2 Well would be allocated according to the "working interest percentages" found in the Operating Agreement.

The L-2 Well was completed on January 23, 1990. The L-2 Well produced substantial quantities of gas from the Dakota formation. The amount of production from the L-2 Well

exceeded the expectations of experts, particularly since the nearby L–1 Well had failed to produce commercial quantities of gas from the Dakota formation.

The United States Department of the Interior, Bureau of Land Management (BLM) owns the mineral rights to the portion of the "subject lands" within Section 22. On September 7, 1990, the BLM, as lessor, demanded that Texaco and Wexpro, as lessees or operating rights owners, act to protect the leased lands from drainage by the L–2 Well. In response, Texaco filed two alternative applications for orders from the Commission.

The first application sought an order to permit Texaco to drill an offset well to prevent the drainage of the gas from Section 22. The offset well would have been located in Section 22 only 800 feet away from the L–2 Well in Section 15. After conducting a hearing on November 14, 1990, the Commission denied the application for an offset well finding that a prudent operator would not drill at this location because it would interfere with the L–2 Well.

On December 13, 1990, the Commission granted Texaco's second application which sought an order to enlarge the drilling unit for the Dakota formation. The Commission ordered that the drilling unit for the Dakota formation be enlarged from 640 acres to 760 acres, which included all of Section 15 and the 120–acre portion of Section 22 which Texaco and Wexpro leased from the BLM. This enlarged drilling unit precisely corresponds with the previously existing drilling unit established for the Frontier formation on these same lands. *See* attached Appendix "A." The Commission determined that this enlarged drilling unit would protect the correlative rights of the BLM, Texaco and Wexpro. Texaco and Wexpro have an obligation, under terms of the Operating Agreement, to pay royalties to the BLM from their allocation of the profits from the L–2 Well.

During the November 14, 1990 hearing to determine if the Commission would grant the application for an enlarged drilling unit for the Dakota formation, Amoco presented expert testimony, accompanied by an exhibit which was admitted into evidence, disclosing the effect on the parties of an enlarged drilling unit. Amoco calculated that if the drilling unit was enlarged, Amoco's "working interest percentages" for production from the L–2 Well would decrease by 8.5197% and Union Pacific's "working interest percentages" would decrease by 4.5796%. Meanwhile, Texaco's "working interest percentages" for production from the L–2 Well would increase by 6.9483% and Wexpro's "working interest percentages" would increase by 6.1510%. However, after the Commission issued its order enlarging the drilling unit for the Dakota formation, Amoco changed its position.

On February 18, 1991, Amoco informed Texaco that it was adopting the position that the Commission's enlarged drilling unit order did not alter the terms for the allocation of production from the Dakota formation contained in the Operating Agreement. "It is Amoco's position that the Operating Agreement is binding on all signatory parties, and the entry of the Commission's Order respacing the Dakota formation in no way changes the party's contractual working interest." Union Pacific joined Amoco in claiming that the "working interest percentages" were not altered by the Commission's enlarged drilling unit order for the Dakota formation. Texaco challenged that it was apparent from reading the Operating Agreement that an enlarged drilling unit would alter the "working interest percentages" for the Dakota formation. Texaco pointed out that the Operating Agreement specifically defined " 'Dakota Owners' " as " 'the working interest owners, owning the working interest in and to the Spacing Unit established for the Dakota formation.' " Wexpro supported Texaco's position. The parties did not seek judicial review of the Commission's order enlarging the drilling unit.

On April 17, 1991, Texaco filed an application with the Commission for a compulsory pooling order to combine the parties' interests and allocate production according to the surface acreage each party contributed to the enlarged drilling unit for the Dakota formation. On May 14, 1991, the Commission held a hearing on the compulsory pooling application. Union Pacific and Amoco protested the application arguing that the Commission

lacked authority to interpret the Operating Agreement. Union Pacific and Amoco both urged the Commission to defer any action until litigation, which had been commenced in Colorado four days before the Commission's hearing, was completed. However, on June 13, 1991, the Commission issued a compulsory pooling order.

The Commission's compulsory pooling order brings together the interests of the parties in the enlarged 760–acre drilling unit on the "subject lands" in the Dakota formation. The Commission found that under the compulsory pooling order, the parties would have the following "working interest percentages" in the L–2 Well:

| | |
|---|---|
| Amoco | 45.4379% |
| Union Pacific | 24.4246% |
| Wexpro | 17.1950% |
| Texaco | 12.9425% |

The Commission concluded that, as a matter of law, the parties had not previously voluntarily pooled their respective interests in the Dakota formation. However, the Commission made this finding "contingent" on the outcome of litigation between the parties on the meaning of the Operating Agreement. Therefore, the parties, under the Commission's order, may apply for rescission or modification of the Commission's order after litigation over the Operating Agreement is completed. On September 10, 1991, Union Pacific and Amoco filed an action in the District Court for the First Judicial District of Wyoming challenging the validity of the Commission's June 13, 1991 compulsory pooling order. Further prosecution of this action has been suspended until a decision on this appeal is finalized.

At the time the Commission issued its compulsory pooling order, the parties were also involved in litigation over the Operating Agreement in the District Court for the City and County of Denver, Colorado. In January, 1992, however, the Colorado court exercised its discretionary power and dismissed the case, without prejudice. The Colorado court declined jurisdiction on the basis of *forum non conveniens.*

On January 31, 1992, Union Pacific and Amoco sought a declaratory judgment from the District Court for the First Judicial District of Wyoming holding that the Operating Agreement fixed the parties' "working interest percentages" in the Dakota formation "irrespective" of the drilling unit orders of the Commission. Texaco and Wexpro both answered and filed counterclaims seeking declaratory judgments in their favor. On June 19, 1992, Texaco filed a motion for summary judgment, which Wexpro joined. Union Pacific and Amoco responded with individual cross-motions for summary judgment.

After extensive briefing and oral argument, the district court granted a partial summary judgment in favor of Texaco and Wexpro. The district court concluded that the terms of the Operating Agreement disclosed that the parties shared production "in proportions which were equal to the proportions of net mineral acres contributed by each to the then applicable spacing units governing production from each formation." The district court determined that when the Commission enlarged the drilling unit for the Dakota formation, the interests of the parties in the proportion of net mineral acres was also altered.

After the partial summary judgment was granted, the parties stipulated to the effects of the amended "working interest percentages" and established escrow accounts to hold the disputed funds until litigation was completed. On September 22, 1993, the district court entered a judgment which required Amoco to deposit $1,620,450.09 along with future proportional shares of monthly production from the L–2 Well in the escrow accounts. The judgment also required Union Pacific to deposit $677,454.40 along with future proportional shares of monthly production from the L–2 Well in escrow accounts. Union Pacific and Amoco both filed notices of appeal.

### III. DISCUSSION

 Summary judgment is appropriate when there is no genuine issue of material fact and the prevailing party is entitled to a judgment as a matter of law. *Lincoln v. Wackenhut Corp.,* 867 P.2d 701, 702 (Wyo. 1994); W.R.C.P. 56(c). When the interpretation of a contract is at issue, summary judgment is proper when the terms of the parties'

agreement do not raise issues of material fact and the terms of the agreement are unambiguous. *Prudential Preferred Properties v. J and J Ventures, Inc.*, 859 P.2d 1267, 1271 (Wyo.1993). The court interprets the language of an unambiguous agreement as a matter of law. *Moncrief v. Louisiana Land and Exploration Co.*, 861 P.2d 516, 523 (Wyo. 1993). On appellate review, this court accords no special deference to the district court's decisions on issues of law. *Coones v. F.D.I.C.*, 848 P.2d 783, 795 (Wyo.1993) (*quoting Powder River Oil Co. v. Powder River Petroleum Corp.*, 830 P.2d 403, 406–07 (Wyo. 1992)).

 Using the same standards and same materials as the district court, we review the record in the light most favorable to the party opposing the motion for summary judgment, giving that party the benefit of all favorable inferences which are fairly derived from the record. *Thunder Hawk By and Through Jensen v. Union Pacific R. Co.*, 844 P.2d 1045, 1047 (Wyo.1992). Our review is designed to determine whether an issue of material fact remains which precludes the granting of a summary judgment as a matter of law. *Keehn v. Town of Torrington*, 834 P.2d 112, 114 (Wyo.1992). When a disputed fact, if proven, would have the effect of establishing or refuting an essential element of the cause of action or defense asserted by the parties, a genuine issue of material fact remains. *Thunder Hawk By and Through Jensen*, 844 P.2d at 1047.

 Various constructions of the Operating Agreement are offered by each party. In the Operating Agreement, Union Pacific asserts the parties unambiguously established their "working interest percentages" for any well drilled on the "subject lands" in the Dakota formation. Union Pacific declares that the express terms of the Operating Agreement do not permit subsequent modification. Accordingly, Union Pacific explains that the Commission's orders cannot supersede the Operating Agreement.

Amoco also maintains that the district court erred in ruling that the Commission's orders superseded the "working interest percentages" in the Operating Agreement. Amoco offers a policy argument suggesting limitations in the doctrine of correlative rights to protect contractual rights. Amoco argues that there is no provision in the Operating Agreement which would adjust the "working interest percentages" in the event of a change in the size of the drilling unit.

Wexpro challenges that the Operating Agreement incorporates principles of Wyoming law. Therefore, the Commission's orders, according to Wexpro, can supersede provisions in the Operating Agreement. Wexpro points out that the Operating Agreement acknowledges the drilling unit orders in place at the time the Operating Agreement was executed. Wexpro maintains that the Commission exercised its statutory obligation to prevent waste and protect correlative rights in enlarging the drilling unit for the Dakota formation.

Texaco argues that before this dispute, all the parties shared the understanding that "working interest percentages" in the Operating Agreement were determined by the amount of surface acreage each party contributed to the drilling unit. Texaco insists that the Operating Agreement does not fix "working interest percentages" for all time and all circumstances. Texaco argues that ambiguity in this language permits the court to resort to extrinsic evidence to determine the intent of the parties.

 In determining if any of these varied constructions of the Operating Agreement are correct, we are guided by our established rules of contract interpretation. Contract interpretation is the process of ascertaining the meaning of the words used by the parties to express their intent. *Doctors' Co. v. Insurance Corp. of America*, 864 P.2d 1018, 1023 (Wyo.1993). The instrument which memorializes the agreement must be considered as a whole with each part being read in light of the other parts. *Id.; Amoco Production Co. v. Stauffer Chemical Co. of Wyoming*, 612 P.2d 463, 465 (Wyo.1980). A contract may consist of several documents. *Cliff & Co., Ltd. v. Anderson*, 777 P.2d 595, 598 (Wyo.1989). An exhibit, attached to a contract and the references made to the exhibit in the contract, become part of the contract as a whole. *Kilbourne–Park Corp.*

*v. Buckingham,* 404 P.2d 244, 245 (Wyo. 1965).

 If the meaning of the contract is ambiguous, or not apparent, it may be necessary to resort to extrinsic evidence to determine the intention of the parties making interpretation a mixed question of law and fact. *Wilder v. Cody Country Chamber of Commerce,* 868 P.2d 211, 216 (Wyo.1994). The intent of the parties to an ambiguous contract is obscured by indefiniteness of expression or by double meaning. *True Oil Co. v. Sinclair Oil Corp.,* 771 P.2d 781, 790 (Wyo. 1989) (*quoting Farr v. Link,* 746 P.2d 431, 433 (Wyo.1987)). Ambiguity is not created, however, by the parties' subsequent disagreement over the meaning of the contract. *Rainbow Oil Co. v. Christmann,* 656 P.2d 538, 542 (Wyo.1982); *Amoco Production Co.,* 612 P.2d at 465.

 When the meaning of a contract is unambiguous, extrinsic evidence is not admitted to contradict the plain meaning of the terms used by the parties. *Prudential Preferred Properties,* 859 P.2d at 1271. Therefore, when the terms of a contract are unambiguous, our search for the intent of the parties is confined to the language contained within the "four corners" of an integrated contract. *Doctors' Co.,* 864 P.2d at 1024; *Prudential Preferred Properties,* 859 P.2d at 1271. Our standard of interpretation for contracts declares that the words used to memorialize the intent of the parties are given the plain meaning that a reasonable person, in the position of the parties, would understand them to mean. *Doctors' Co.,* 864 P.2d at 1023; *Wangler v. Federer,* 714 P.2d 1209, 1213 (Wyo.1986).

Our review of the Operating Agreement directs a conclusion that the language is unambiguous as a matter of law. *True Oil Co.,* 771 P.2d at 790. Accordingly, we need not consider extrinsic evidence to determine the intent of the parties. *Doctors' Co.,* 864 P.2d at 1024; *Prudential Preferred Properties,* 859 P.2d at 1271. However, the language of the Operating Agreement is not always simple or direct. The Operating Agreement was negotiated and drafted by professionals in a technical industry, using distinctive terminol-ogy for which customary meanings are often assumed.

The parties styled their agreement as an "Operating Agreement." The term, operating agreement, has come to have a plain meaning which reasonable persons in the oil and gas industry understand as denoting:

An agreement between or among interested parties for the testing and development of a tract of land. Typically one of the parties is designated as the operator and the agreement contains detailed provisions concerning the drilling of a test well, the drilling of any additional wells which may be required, the sharing of expenses, and accounting methods. The authority of the operator, and restrictions thereon, are spelled out in detail in the typical agreement.

8 Howard R. Williams & Charles J. Meyers, *Oil and Gas Law, Manual of Oil and Gas Terms,* 837 (1991). The provisions of the Operating Agreement conform to this standard and disclose the intent of the parties to form this type of contract.

After identifying Amoco as the operator of the "subject lands," Article 2 of the Operating Agreement contains the language which the parties dispute:

2. *OWNERSHIP OF PRODUCTION; MATERIAL AND EQUIPMENT:*

A. *Production.* Subject to Article 6 hereof [dealing with royalties], all gas and associated liquid hydrocarbons produced and saved from the Frontier formation within the Subject Lands shall be allocated in the proportions of the acreage lying outside the participating area and the acreage inside the participating area with that portion of the production allocated to the participating area to be shared by the working interest owners in the same manner as the remainder of the production in the participating area is shared. Production allocated to the acreage outside the participating area will be owned by the working interest owners and the royalty owners of that acreage. Production outside the participating area for the Frontier formation will be allocated as provided in the Communitization Agreement attached hereto as Exhibit "A." ***Allocation of pro-***

*duction shall be owned by the parties hereto in the following "working interest percentages":*

| | *Frontier* | *Dakota* |
|------------|-------------|-----------|
| *[Wexpro]* | *15.62501%* | *11.04410%* |
| *Amoco* | *46.71052%* | *53.95750%* |
| *[Union Pacific]* | *21.87500%* | *29.00420%* |
| *Texaco* | *15.78947%* | *5.99420%* |

The unleased Champlin acreage committed hereto (i.e., the NE/4 of said Section 15) shall be treated as though leased subject to a landowner's royalty of 15% owned by [Union Pacific].

(Emphasis added.)

Article 2 initially distinguishes between the acreage located within the "participating area" and the acreage located outside the "participating area." The "participating area" is defined elsewhere in the Operating Agreement as acreage which is subject to a voluntary pooling agreement dated July 14, 1972. The acreage included in the "participating area" encompasses all of the northwestern quarter of Section 15 and a portion of the southwestern quarter of Section 15. The first three sentences of Article 2 describe the allocation of production from the acreage inside the "participating area" and the acreage outside the "participating area." After noting this distinction, Article 2 details the "working interest percentages" for the Frontier and Dakota formations.

While the parties focus on the language detailing the specific "working interest percentages," our review of Article 2, as a whole, discloses the inherent limitations of the Operating Agreement. The convoluted language of the first three sentences of Article 2 is focused exclusively on the allocation of production from the drilling unit established for the Frontier formation. The only mention of allocation of production from the drilling unit established for the Dakota formation occurs when the "working interest percentages" are detailed. Unfortunately, the parties do not explain anywhere in the Operating Agreement the precise method used to calculate the "working interest percentages" other than by the reference to surface acreage either inside or outside the "participating area."

The references in Article 2 to the Frontier formation or the Dakota formation may be considered generic; however, other provisions of the Operating Agreement illuminate the intent of the parties to relate these terms to the drilling units established by the Commission. In Article 4, the parties provided for the allocation of drilling costs and expenses in detail. The Article 4 definitions refer to the Commission's orders establishing drilling units:

A. Definition[s]:

"Frontier Owners"—the working interest owners owning the working interests in and to the Spacing Unit established for the Frontier formation.

"Dakota Owners"—the working interest owners, owning the working interest in and to the Spacing Unit established for the Dakota formation.

In the Operating Agreement, the parties refer, interchangeably, to a "drilling and spacing unit" or to a "spacing unit." The terms "spacing unit" or "drilling unit" are used in the oil and gas industry to describe the area which an administrative agency has determined one well can efficiently drain. *See* 8 Williams & Meyers, *supra*, at 357–58, 1359–62. Wyoming law refers to drilling units. Wyo.Stat. § 30–5–109(a) (1983).

The Operating Agreement contains an express reference to the Commission's orders establishing drilling units. After identifying the ownership interests of each of the parties in the "subject lands," the Operating Agreement includes a recital (hereinafter the drilling unit recital), which states:

WHEREAS, by Order No. 11, entered September 18, 1981, in Docket No. 191–81, the Oil and Gas Conservation Commission of the State of Wyoming established the Subject Lands as a 760–acre drilling and spacing unit for the production of natural gas and associated liquid hydrocarbons from the Frontier formation; and, by Order No. 1 [sic], entered September 9, 1981 [sic], in Docket No. 190–81, the Oil and Gas Conservation Commission of the State of Wyoming established the Subject Lands on the 640–acre drilling and spacing unit for the production of natural gas and asso-

ciated liquid hydrocarbons from the Dakota formation[.]

A "recital" is a formal statement in a document of some matter of fact "to explain the *reasons* for the transaction." *Wells–Stewart Const. Co. v. Martin Marietta Corp.*, 103 Ariz. 375, 442 P.2d 119, 123 (1968) (emphasis in original). *See also* Black's Law Dictionary 1270 (6th ed. 1990). In the law of estoppel, a particular and definite recital provides conclusive evidence of the material facts stated. *Kellogg v. Dennis*, 38 Misc. 82, 77 N.Y.S. 172, 175 (1902).

The language of the drilling unit recital is not the model of clarity. However, it is sufficient to disclose that the Operating Agreement was formed with the parties' express acknowledgement of the Commission's authority to regulate the size of drilling units in the Frontier and Dakota formations. The drilling unit recital conclusively establishes that the parties formed their agreement to correspond with the 760–acre drilling unit for the Frontier formation and the 640–acre drilling unit for the Dakota formation. These are the drilling units established by the Commission's September 18, 1981 orders. However, according to the interpretations advanced by Union Pacific and Amoco, the Operating Agreement does not acknowledge any subsequent Commission action. We disagree.

In Wyoming, the parties to a contract are presumed to enter into their agreement in light of existing principles of law. *Black & Yates, Inc. v. Negros–Philippine Lumber Co.*, 32 Wyo. 248, 258, 231 P. 398, 401 (1924). *Accord* 4 Walter H.E. Jaeger, *Williston on Contracts*, § 615 at 602 (3rd ed. 1961). These existing principles of law enter into and become a part of a contract as though referenced and incorporated into the terms of the agreement. *Century Ready Mix Co. v. Lower & Co.*, 770 P.2d 692, 696 (Wyo.1989); *Tri–County Elec. Ass'n, Inc. v. City of Gillette*, 584 P.2d 995, 1007 (Wyo.1978). We could apply this presumption to hold that the principles of law by which Wyoming regulates the oil and gas industry became a part of the Operating Agreement. However, the parties expressly referenced and incorporated these principles of law in the Operating Agreement.

The Operating Agreement incorporates a statement of Operating Provisions. The Operating Provisions are contained in Exhibit "D" and are referenced in the Operating Agreement so as to become a part of the contract as a whole. *Kilbourne–Park Corp.*, 404 P.2d at 245. The Operating Provisions state terms for accounting procedures, operations of producing wells, and abandonment of wells. Operating Provision Number 16 states:

This agreement shall be subject to all valid and applicable State and Federal laws, rules, regulations and orders, and the operations conducted hereunder shall be performed in accordance with said laws, rules, regulations and orders. *In the event this agreement or any provisions hereof are, or the operations contemplated hereby are found to be inconsistent, with or contrary to any such law, rule, regulation or order, the latter shall be deemed to control and this agreement shall be regarded as modified accordingly and, as so modified, shall continue in full force and effect.*

(Emphasis added.)

We hold that the plain language of the Operating Agreement incorporates principles of Wyoming law and provides for modifications of the terms of agreement when the terms of the contract are contrary to an order of the Commission. Therefore, we must determine what modifications to the Operating Agreement resulted from the Commission's December 13, 1990 order enlarging the drilling unit for the Dakota formation or from the Commission's June 13, 1991 compulsory pooling order. This determination requires an understanding of the authority which the Commission exercises.

In 1951, the legislature enacted the Oil and Gas Conservation Act, Wyo.Stat. §§ 30–5–101 to 30–5–104 and §§ 30–5–108 to 30–5–119 (1983 & Cum.Supp.1994) (hereinafter the Act) to regulate the oil and gas industry in the state. *See* Mark W. Gifford, *The Law Of Oil And Gas In Wyoming: An Overview*, XVII Land & Water L.Rev. 401, 415 (1982). The Act establishes the Commission, Wyo.

Stat. § 30–5–103, and declares that the Commission "has jurisdiction and authority over all persons *and property,* public and private, necessary to effectuate the purposes and intent * * *" of the Act. Wyo.Stat. § 30–5–104(a) (emphasis added).

■■■■ The Commission exercises the police power of the State of Wyoming when it issues its orders. *Big Piney Oil & Gas Co. v. Wyoming Oil & Gas Conservation Com'n,* 715 P.2d 557, 563 (Wyo.1986). Contract rights and property rights are subject to a reasonable exercise of police power. *Bulova Watch Co. v. Zale Jewelry Co. of Cheyenne,* 371 P.2d 409, 417 (Wyo.1962); *Delatte v. Woods,* 232 La. 341, 94 So.2d 281, 287 (1957); *Superior Oil Co. v. Foote,* 214 Miss. 857, 59 So.2d 85, 93 (1952). When the police power is exercised to restrict contract rights, we must determine whether the restrictions are reasonable and within the scope of the police power. *Mountain Fuel Supply Co. v. Emerson,* 578 P.2d 1351, 1356 (Wyo.1978). A valid conservation agency order directing the establishment or modification of a drilling unit does not unconstitutionally impair contract rights. *Patterson v. Stanolind Oil & Gas Co.,* 305 U.S. 376, 379, 59 S.Ct. 259, 260, 83 L.Ed. 231 (1939); *Alston v. Southern Production Co.,* 207 La. 370, 21 So.2d 383, 386 (1945); E.H. Schopler, Annotation, *Validity Of Compulsory Pooling Or Unitization Statute Or Ordinance Requiring Owners Or Lessees Of Oil and Gas Lands To Develop Their Holdings As A Single Drilling Unit And The Like,* 37 A.L.R.2d 434, 438 (1954).

The Act does not contain an express statement of purpose. However, this court has recognized that we may ascertain the intent and general purpose of an act by giving effect to every word, clause and sentence and construing all components as a whole. *Parker Land and Cattle Co. v. Wyoming Game and Fish Com'n,* 845 P.2d 1040, 1042 (Wyo. 1993) (quoting *Ross v. Trustees of University of Wyoming,* 31 Wyo. 464, 489, 228 P. 642, 651 (1924) and *City of Laramie v. Facer,* 814 P.2d 268, 270 (Wyo.1991)).

■■■■ Our reading of the Act discloses that the purpose is to provide a comprehensive regulatory program which prevents the waste of Wyoming's oil and gas resources and protects the correlative rights of property owners. Wyo.Stat. § 30–5–102; Wyo.Stat. § 30–5–109. The Act, therefore, represents a legislative modification to the rule of capture. *Texaco, Inc. v. Industrial Com'n of State of North Dakota,* 448 N.W.2d 621, 623 (N.D.1989). Under the rule of capture, a land owner acquired title to all the oil and gas which the land owner could produce, even when it was proven that some of the oil and gas migrated from adjoining lands. 8 Williams & Meyers, *supra,* at 1102–1105 (quoting Hardwicke, *The Rule of Capture and Its Implications As Applied to Oil and Gas,* 13 Texas L.Rev. 391, 393 (1935)). The Act permits the Commission to establish drilling units to protect the public interest by preventing waste and protecting correlative rights. *Pan Am. Petroleum Corp. v. Wyoming Oil and Gas Conservation Com'n,* 446 P.2d 550, 551–52 (Wyo.1968).

The Act defines "waste" broadly as occurring under various circumstances:

(i) The term "waste" means and includes:

(A) Physical waste, as that term is generally understood in the oil and gas industry;

(B) The inefficient, excessive or improper use, or the unnecessary dissipation of, reservoir energy;

(C) The inefficient storing of oil or gas;

(D) The locating, drilling, equipping, operating, or producing of any oil or gas well in a manner that causes, or tends to cause, reduction in the quantity of oil or gas ultimately recoverable from a pool under prudent and proper operations, or that causes or tends to cause unnecessary or excessive surface loss or destruction of oil or gas;

(E) The production of oil or gas in excess of (I) transportation or storage facilities; (II) the amount reasonably required to be produced in the proper drilling, completing, or testing of the well from which it is produced, or oil or gas otherwise usefully utilized: except gas produced from an oil well pending the time when with reasonable diligence the gas can be sold or otherwise usefully

utilized on terms and conditions that are just and reasonable;

(F) Underground or aboveground waste in the production or storage of oil, gas, or condensate, however caused, and whether or not defined in other subdivisions hereof; and

(G) The flaring of gas from gas wells except that necessary for the drilling, completing or testing of the well;

(H) The drilling of any well not in conformance to a well density and spacing program fixed by the commission or other agency, state or federal, as to any field or pool during a national emergency when casing or other materials necessary to the drilling and operation of wells are rationed or in short supply.

Wyo.Stat. § 30–5–101(a)(i). "Physical waste" is commonly understood in the oil and gas industry as referring to operational losses in oil and gas production resulting from either: surface loss or destruction of oil and gas; or, underground loss or destruction of oil and gas. 8 Williams & Meyers, *supra*, at 907.

Surface loss of oil is due principally to evaporation and surface loss of gas is due principally to burning at field flares or blowing into the atmosphere. Underground loss is due to failure to recover the maximum quantity which theoretically could be produced, as by dissipation of reservoir pressure.

*Id.*

The Act also defines "correlative rights:"

(ix) "Correlative rights" shall mean the opportunity afforded the owner of each property in a pool to produce, so far as it is reasonably practicable to do so without waste, his just and equitable share of the oil or gas, or both, in the pool.

Wyo.Stat. § 30–5–101(a)(ix). Wyoming has recognized that correlative rights and the right to produce oil and gas from a pool are limited by a duty not to injure the pool and a duty not to cause waste. *Trout v. Wyoming Oil and Gas Conservation Com'n,* 721 P.2d 1047, 1051 (Wyo.1986); *Gilmore v. Oil and Gas Conservation Com'n,* 642 P.2d 773, 778 (Wyo.1982). The term "pool," as a noun, means "an underground reservoir containing a common accumulation of oil or gas, or both." Wyo.Stat. § 30–5–101(a)(iii). Under Wyoming law, each zone of a general structure, which is completely separated from any other zone in the structure, is also a "pool." *Id.*

The legislature authorized the Commission to "make rules, regulations, and orders * * *" and take other appropriate action to effectuate the purposes and intent of the Act. Wyo.Stat. § 30–5–104(c). In *Mitchell v. Simpson,* 493 P.2d 399, 401–02 (Wyo.1972), this court considered a jurisdictional challenge brought by the owner of a royalty interest who argued that he was not subject to the Commission's orders. We held that the Commission has the authority to establish a drilling unit to "prevent or assist in the prevention of waste or to protect correlative rights[.]" *Id.* at 402. After the drilling unit is established, the Commission also has the authority to order the pooling of all interests, including royalty interests. *Id.*

*Larsen v. Oil and Gas Conservation Com'n,* 569 P.2d 87, 89–90 (Wyo.1977) recognizes that the Commission exercises its authority in distinct stages. First, the drilling unit is established. This occurs only if the Commission makes a sufficient finding that a drilling unit is necessary to prevent waste or protect correlative rights. *Id.* Second, the compulsory pooling order is issued, if necessary. These stages are directed by statute. *Id.*

The legislature provided the Commission with the broad authority to establish drilling units:

(a) When required, to protect correlative rights or, to prevent or to assist in preventing any of the various types of waste of oil or gas prohibited by this act, or by any statute of this state, the commission, upon its own motion or on a proper application of an interested party, but after notice and hearing as herein provided shall have the power to establish drilling units of specified and approximately uniform size covering any pool.

Wyo.Stat. 30–5–109(a). The limitation on this authority is that the acreage encompassing the drilling unit and the shape of the drilling unit "shall not be smaller than the

maximum area that can be efficiently drained by one (1) well." Wyo.Stat. § 30–5–109(b).

The legislature also gave the Commission continuing authority to modify its orders after a drilling unit is established:

> (d) The commission, upon application, notice, and hearing, may decrease the size of the drilling units or permit additional wells to be drilled within the established units in order to prevent or assist in preventing any of the various types of waste prohibited by this act or in order to protect correlative rights, and the commission may enlarge the area covered by the order fixing drilling units, if the commission determines that the common source of supply underlies an area not covered by the order.

Wyo.Stat. § 30–5–109(d). The plain language of this provision expressly authorizes the Commission to "decrease the size of the drilling units * * *." *Id.* The legislature also authorized the Commission to "enlarge the area covered by the order fixing drilling units * * *" when data is developed that establishes the extent of the common source of supply. *Id.* The legislature, therefore, provided for the Commission's continuing authority to protect the public interest.

■■■ While Wyo.Stat. § 30–5–109(d) does not expressly authorize an order enlarging the size of a particular drilling unit, the Act grants the Commission implied authority to modify its orders in such a manner. *Accord Bennion v. ANR Production Co.,* 819 P.2d 343, 351 (Utah 1991) (holding administrative agency had implied authority under Utah Oil and Gas Conservation Act to modify pooling orders). *See also Application of Bennett,* 353 P.2d 114, 118–19 (Okla.1960) and *Railroad Com'n v. Aluminum Co. of America,* 380 S.W.2d 599, 602 (Tex.1964). The legislature authorized the Commission to decrease the size of a drilling unit to prevent waste and to protect correlative rights. Wyo.Stat. § 30–5–109(d). If, based upon the evidence, the Commission determines it is necessary to increase the size of a particular drilling unit to prevent waste or to protect correlative rights, the Commission has continuing authority to modify its previous orders. *Accord Amoco Production Co. v. North Dakota Indus. Com'n,* 307 N.W.2d 839, 843 (N.D.1981) (holding administrative agency has continuing duty and authority to modify orders establishing drilling units when necessary to prevent waste or protect correlative rights).

The establishment or modification of a drilling unit requires the Commission to determine the amount of acreage in the unit and the shape of the unit. *Larsen,* 569 P.2d at 90. After the drilling unit is established, exploitation of the minerals, other than in accord with statutory requirements, is prohibited. Wyo.Stat. § 30–5–109(e). The right to exploit minerals in a drilling unit is conditioned, however, on the status of the ownership of the lands or the mineral interests. Wyo.Stat. § 30–5–109(c) and (f).

■■■ If the lands or mineral interests in a particular drilling unit are held by a single owner, that owner is entitled to an opportunity to drill for and produce, as a prudent operator, a just and equitable share of the oil or gas in a pool, subject to the conservation requirements of the Act. Wyo.Stat. § 30–5–104(d)(iv). If tracts of land or mineral interests within a drilling unit are separately owned, the Act requires another step before exploitation of the minerals may commence. The Act identifies two alternative courses of action, voluntary or compulsory pooling, permitting individual owners to exploit their rights to the minerals underlying their lands:

> (f) When two (2) or more separately owned tracts are embraced within a drilling unit, or when there are separately owned interests in all or a part of the drilling unit, then persons owning such interests may pool their interests for the development and operation of the drilling unit. In the absence of voluntary pooling, the commission, upon the application of any interested person, may enter an order pooling all interests in the drilling unit for the development and operation thereof. Each such pooling order shall be made after notice and hearing and shall be upon terms and conditions that are just and reasonable. Operations incident to the drilling of a well upon any portion of a unit covered by a pooling order shall be deemed for all purposes to be the conduct of such operations upon each separately

owned tract in the unit by the several owners thereof. That portion of the production allocated or applicable to each tract included in a unit covered by a pooling order shall, when produced, be deemed for all purposes to have been produced from such tract by a well drilled thereon. Wyo.Stat. § 30–5–109(f). The term "pooling," the present participle of the verb "pool," is used to denominate the bringing together of small tracts of land for the granting of a well permit within an established drilling unit. 8 Williams & Meyers, *supra,* at 921–22.

Our review of the Act discloses that in Wyoming, drilling units are established for the limited purpose of controlling the density of drilling to prevent waste and to protect correlative rights. Wyo.Stat. § 30–5–109(a). *See* 5 Eugene Kuntz, *A Treatise on the Law of Oil And Gas,* § 77.3(c) (1991) (distinguishing between effect of various types of drilling unit statutes). The Commission's December 13, 1990 order enlarging the drilling unit for the Dakota formation follows the requirements of the Act. The Commission acted under its implied authority to modify a previous drilling unit order. Wyo.Stat. § 30–5–109(d). The Commission concluded, as a matter of law, that establishing a 760–acre drilling unit for the Dakota formation would prevent waste from the drilling of an offset well in Section 22. The Commission also ruled that the correlative rights of the BLM and its lessees, Texaco and Wexpro, to produce a just and equitable share of gas from Section 22 required protection from the drainage occurring as a result of the L–2 Well in Section 15. The Commission found that the L–2 Well was capable of efficiently draining the pool underlying the enlarged 760–acre drilling unit. These findings of fact and *conclusions of law are not subject to collateral attack in this appeal.*

■ Except for the due process rights accorded "interested parties," the establishment of a drilling unit occurs without regard to ownership interests. Wyo.Stat. § 30–5–109(a). There is no reference to the allocation of ownership interests in any provision of the Act dealing with the establishment or modification of drilling units. Therefore, establishing or modifying a drilling unit does not have the effect of apportioning production from the unit. *Accord Manufacturers Nat. Bank of Detroit v. Director of Dept. of Natural Resources,* 420 Mich. 128, 362 N.W.2d 572, 579 (1984) (holding under Michigan law, establishment of a drilling unit does not pool ownership interests); *Rutter & Wilbanks Corp. v. Oil Conservation Com'n,* 87 N.M. 286, 288, 532 P.2d 582, 584 (1975) (holding under New Mexico law, establishment of a drilling unit does not automatically result in the proration of oil and gas production); and *Schank v. North Am. Royalties, Inc.,* 201 N.W.2d 419, 430–31 (N.D.1972) (holding under North Dakota law, a well spacing order does not operate as a de facto pooling of ownership interests). We hold the Commission's order of December 13, 1990 enlarging the drilling unit for the Dakota formation did not automatically apportion production from the unit.

While the enlarged drilling unit for the Dakota formation did not result in an apportionment of production, we hold the Commission's order of December 13, 1990 superseded some of the terms of the Operating Agreement in a reasonable exercise of the police power.

Restatement (Second) of Contracts § 264 (1981) recognizes that performance of a contractual duty may be impracticable as a result of government action:

> If the performance of a duty is made impracticable by having to comply with a domestic or foreign governmental regulation or order, that regulation or order is an event the non-occurrence of which was a basic assumption on which the contract was made.

Other jurisdictions acknowledge that when the agency charged with the responsibility for oil and gas conservation issues an order which conflicts with contractual provisions, the agency order supersedes or supplements the contractual provisions. *See, e.g., Pacific Enterprises Oil Co. (USA) v. Howell Petroleum Corp.,* 614 So.2d 409, 414 (Ala.1993) (holding conservation agency order respacing drilling units superseded some provisions of farm-out agreement) and *Delatte,* 94 So.2d at 287 (holding conservation agency order es-

tablishing drilling unit superseded some provisions of lease agreement).

*Alston*, 21 So.2d at 384 illustrates the operation of these principles of law. In *Alston*, the conservation agency increased the size of drilling units which had been previously established. *Id.* The increase in the size of the drilling unit was mandated by a federal emergency order issued during World War II which restricted the use of material for drilling after 1941. *Id.* at 386. The working interest owners had previously entered into voluntary pooling agreements covering the former drilling unit. However, the Supreme Court of Louisiana determined that the terms of these agreements had been superseded by the order enlarging the drilling unit. *Id.*

Union Pacific, Amoco, Wexpro and Texaco included in the Operating Agreement a drilling unit recital which conclusively established a basic assumption on which their agreement was made. The parties assumed that the 640 acres in Section 15 would always comprise the drilling unit for the Dakota formation. The terms of the Operating Agreement anticipated production only from the Dakota formation drilling unit established by the Commission's order of September 18, 1981. There is no other reasonable construction of the Operating Agreement.

At the time the parties entered into the Operating Agreement, the entire drilling unit for the Dakota formation in Section 22 was not included within the "subject lands." The parties had no exclusive rights to drill and produce from the Dakota formation underlying Section 22. The Communitization Agreement incorporated in the Operating Agreement and permitting development of the subject lands in Section 22 is specifically limited to development of the Frontier formation. Therefore, development of the Dakota formation in any part of Section 22 was not anticipated by the terms of the Operating Agreement.

The Operating Agreement does not provide for the effect of any future changes in the size of the drilling unit for the Dakota formation. The Operating Agreement also does not disclose the means used by the parties to arrive at the "working interest percentages" contained in Article 2. Without such information, reformation of the Operating Agreement is impossible. The language of Operating Provision Number 16, however, discloses the parties intent to permit modifications of the Operating Agreement when any provision is found to be inconsistent with or contrary to a government order. We hold that as a result of the Commission's order of December 13, 1990 enlarging the drilling unit for the Dakota formation, the inconsistent provisions of the Operating Agreement were superseded. *Pacific Enterprises Oil Co. (USA)*, 614 So.2d at 414; *Delatte*, 94 So.2d at 287; *Alston*, 21 So.2d at 386. Specifically, the "working interest percentages" for the Dakota formation contained in Article 2 were rendered without further effect as of December 13, 1990.

Under Wyoming law, the Commission exercises its authority to apportion production, allocate costs, and make provisions for the drilling and operation of a well only when a compulsory pooling order is issued. Wyo. Stat. § 30–5–109(f) and (g). The Commission orders compulsory pooling of ownership interests when a drilling unit contains separately owned tracts of land or separately owned mineral interests. Wyo.Stat. § 30–5–109(f). If the owners have previously entered into a voluntary pooling agreement covering the appropriate drilling unit, the Commission need not exercise its authority. *Id.*

Union Pacific erroneously attempts to construe the Operating Agreement as a voluntary pooling agreement for the enlarged Dakota formation drilling unit. This argument is without merit. The Operating Agreement incorporates the October 7, 1981 Communitization Agreement. The Communitization Agreement voluntarily pooled the parties' interests in Section 15 and Section 22, but only for the Frontier formation. The express language of the Communitization Agreement provides: "[T]his agreement shall include only the Frontier formation underlying said lands and the natural gas and associated liquid hydrocarbons, hereinafter referred to as 'communitized substances,' producible from such formation."

There is no plain language in the Operating Agreement disclosing an intent to voluntarily pool the parties' interests in a 760–acre Dakota formation drilling unit. This is easily explained. At the time the parties formed the Operating Agreement, the enlarged drilling unit for the Dakota formation had not been established. We hold that when the Commission issued its June 13, 1991 compulsory pooling order, there was no effective voluntary pooling agreement covering all the parties' interests in the enlarged Dakota formation drilling unit.

In the absence of a voluntary pooling agreement, the Commission is authorized to issue a compulsory pooling order. Wyo.Stat. § 30–5–109(f). Under Wyoming law, a compulsory pooling order apportions production among each separately owned tract of land in the drilling unit. *Id.* We offer no opinion on the validity of the Commission's compulsory pooling order of June 13, 1991 since that is the subject of separate litigation in the district court.

## IV. CONCLUSION

"When parties make a contract and reduce it to writing, they must abide by its plainly stated terms." *Colorado Interstate Gas Co. v. Natural Gas Pipeline Co. of America*, 842 P.2d 1067, 1070 (Wyo.1992). However, even plainly stated terms may be the subject of significant disputes. The parties to the Operating Agreement are sophisticated corporate entities with considerable experience in forming these types of agreements. The parties also understand that their business involves a highly regulated industry. Despite these skills, the parties failed to anticipate the likelihood that a basic fact on which their agreement was premised might change. The parties never provided for the allocation of production from a well on a 760–acre drilling unit in the Dakota formation.

We affirm.

APPENDIX A