John H. LARSEN, Edna Carter and Paul
W. Sherard, Appellants
(Petitioners below),

v.

The OIL AND GAS CONSERVATION
COMMISSION of the State of Wyoming,
Apache Exploration Corporation, Aquar-
ius Resources Corporation, Double U Oil
Company, Jake L. Hamon, Owen P.
Miles, Jr., Don O. Chapel and Margaret
C. Hose, Appellees (Respondents below).

No. 4578.

Supreme Court of Wyoming.

Sept. 1, 1977.

Motion for Rehearing to Modify and Clarify
Opinion Denied Oct. 12, 1977.

George Porter, of Wehrli & Williams, Casper, and E. E. Lonabaugh and Dan B. Riggs, of Lonabaugh, Vanderhoef & Koester, Sheridan, for John H. Larsen and Edna Carter, appellants.

Thomas Morgan, of Morgan & Brorby, Gillette, for Paul W. Sherard, appellant.

William F. Drew and Claude W. Martin, of Brown, Drew, Apostolos, Barton & Massey, Casper, for Apache Exploration Corp., Jake L. Hamon and Don O. Chapel, appellees.

R. R. Bostwick, of Murane, Bostwick, McDaniel, Scott, Greenlee & Owens, Casper, for Aquarius Resources Corp., Double U Oil Co., Owen T. Miles and Margaret Hose, appellees.

William M. Sutton, Sp. Asst. Atty. Gen., Cheyenne, for The Oil and Gas Conservation Commission of the State of Wyoming, appellee.

Before GUTHRIE, C. J., and McCLINTOCK, RAPER, THOMAS and ROSE, JJ.

ROSE, Justice. ·

This is an appeal from a judgment of the district court affirming an order entered by the Wyoming Oil and Gas Conservation Commission which established eighty-acre drilling units in the North Rainbow Ranch Field, Campbell County, Wyoming. These units were to run horizontally or East-West, except for those located in the SW¼ of Section 24, which were to run vertically or North-South. At the conclusion of this opinion is a plat, marked Appendix "A," indicating the area with which we are concerned, with the wells located thereon. Appellants are owners of royalty and overriding royalty interests under leases covering the W½SE¼, the SE¼SE¼, the SW¼NE¼ and the SW¼ of Section 24. Appellee, Apache Exploration Corporation, is the owner of working interests in, and operator of, all wells drilled in the Minnelusa formation within the spaced area. The remaining appellees are owners of working interests under United States oil and gas leases covering the NE¼SE¼ and other portions of Section 24.

On December 21, 1972, Apache filed an application with the Commission seeking to establish eighty-acre drilling units for the production of hydrocarbons from the Minnelusa formation. The application was based on the discovery of oil and associated hydrocarbons in the NW¼NE¼ of Section 24. Without notice to the appellants, a hearing on the application was conducted before the Commission on January 9, 1973. On January 18, 1973, the Commission entered an order which established eighty-acre drilling units and provided that wells would be permitted only in the center of the SE¼ and the center of the NW¼ of each quarter section. This order was made temporary for a period of ninety days because the Commission found that the need for eighty-acre spacing was not yet conclusive. Although not approved by the United States Geological Survey until May 7, 1973, the appellees entered into communitization agreements covering the NE¼ and the N½ SE¼ of Section 24, which were effective February 1, 1973. During February, 1973, producing wells were completed in the S½ NE¼ and the S½NW¼ of Section 24, and a dry hole was encountered in the W½ SW¼. On April 1, 1973, a producing well was completed in the NW¼SE¼. It is this well which is at the center of the present controversy. On its own motion, the Commission called a hearing to review its original order, which was conducted on April 10, 1973. Again, appellants were not personally notified of the hearing, but they did appear to object to a continuation of the prior order, especially as it related to the horizontal drilling units in the SE¼ of Section 24. Appellants' objection to the spacing-unit direction was premised on a belief that the two forty-acre tracts comprising the N½SE ¼ of Section 24 did not contribute equally to the well located in the NW¼SE¼. On

April 23, 1973, the Commission affirmed its previous order. Pursuant to an application made by Apache, the Commission force-pooled all interests in the N½SE¼ of Section 24.

The appellants' petition for review of the April 23 order culminated in a judgment, entered by the district court on January 16, 1974, which declared the Commission's orders of January 18 and April 23, 1973, to be void and of no further force or effect, and remanded the matter to the Commission for rehearing, with the direction that all evidence in existence at the time of the new hearing should be considered. Subsequently, appellees Aquarius and Double U filed their application for a reestablishment and continuation of the drilling units referred to previously. On the basis of this application and its own motion, the Commission held another hearing on July 16 and 19, 1974, at which time all interested parties presented evidence and argument. Some of the evidence presented at this hearing will be discussed in the course of this opinion. On August 13, 1974, the Commission entered findings of fact and conclusions of law, which in effect continued the previously-established drilling and spacing units. Appellants again filed a petition for review of the Commission's decision. On June 23, 1975, the district court entered its order summarily affirming the decision. The matter is now before this court for disposition.

On appeal, appellants raise essentially four issues, which are stated as follows:

"I.

"The Commission acted without [sic] and in excess of its powers when it ordered a drilling and spacing unit established in the N½ of the SE¼ of Section 24 as such order does not protect the correlative rights of all the property owners and does not prevent or assist in the prevention of waste."

"II.

"The Commission acted without authority and in excess of its powers when it ordered a drilling and spacing unit established in the N½ of the SE¼ of Section 24 when all evidence showed that the unit well was efficiently draining a much larger area and the Commission's findings of fact demonstrate that the unit well is draining more than 80 acres, thus making the order void on its face."

"III.

"The Commission acted without authority and in excess of its powers when it entered the spacing order in this case and made it retroactive for a period of eighteen months, when the oil produced from the well located on appellants' lands had become the personal property of and belonged absolutely to the owners of the interests of the tract on which the oil was produced."

"IV.

"An order of the Commission establishing a drilling and spacing unit, even if valid, does not operate to pool the interests within the unit unless there is a voluntary communitization agreement or a valid compulsory pooling order."

With respect to the first issue, appellants contend that the Commission's Conclusion of Law No. 8 is not supported by findings of underlying or basic facts. Conclusion of Law No. 8 states:

"Eighty (80) acre drilling and spacing units will protect correlative rights of each owner (as that term is defined by Sec. 30–216(e), [sic] [should be § 30–216(i) ] Wyoming Statutes 1957) in the field and will prevent or assist in preventing the various types of waste defined in the Oil and Gas Conservation Act."

We agree with appellants' observation and, therefore, will remand the case for further findings of fact; and inasmuch as the case is not yet ripe for review, we will not reach the remaining issues.

The authority of the Commission to establish drilling and spacing units is set forth in § 30–221(a), W.S.1957, C.1967, 1975 Cum.Supp., which states:

"*When required, to protect correlative rights or, to prevent or to assist in preventing any of the various types of waste of oil or gas prohibited by this act [§§ 30–216 to 30–231], or by any statute of this*

state, the commission, upon its own motion or on a proper application of an interested party, but after notice and hearing as herein provided shall have the power to establish drilling units of specified and approximately uniform size covering any pool." [Emphasis supplied]

The statutory language mandates that before a drilling unit can be established, the Commission must first find that such a unit is necessary to protect correlative rights [1] or to prevent waste.[2] After this initial determination is reached, the Commission must also determine the acreage to be embraced within each unit and the shape thereof—based on evidence adduced at the hearing—but each unit "shall not be smaller than the maximum area that can be efficiently drained by one well." § 30–221(b), W.S. 1957, C.1967. The process of making these various findings and decisions is constrained, however, by fundamental rules of administrative law.

■ Section 9–276.28, W.S.1957, 1975 Cum.Supp., provides that the final decision of an administrative agency "shall include findings of fact and conclusions of law sep-

arately stated." The same section goes on to say that "[f]indings of fact if set forth in statutory language, shall be accompanied by a concise and explicit statement of the underlying facts supporting the findings." The first of these requirements imposes a duty on the agency to make findings of basic facts upon which its ultimate findings of fact or conclusions are based and without which there can be no "rational basis for judicial review." *Pan American Petroleum Corporation v. Wyoming Oil and Gas Conservation Commission*, Wyo., 446 P.2d 550, 555. In *Pan American Petroleum Corporation* we said:

"To aid a reviewing court in the performance of such a function and other limited functions assigned to it by § 14(c) of the Administrative Procedure Act, Ch. 108, S.L. of Wyoming, 1965 (§ 9–276.32(c), W.S.1957, 1967 Cum.Supp.), and particularly with reference to technical factual issues which must be resolved, § 10 of such Act (§ 9–276.28, supra) wisely requires an agency in a contested case to include in its final decision 'findings of fact and conclusions of law separately stated.' *Such requirement imposes upon an agency the duty to make findings of*

1. The phrase "Correlative rights" is defined in § 30–216(i), W.S.1957, C.1967, as:

   ". . . the opportunity afforded the owner of each property in a pool to produce, so far as it is reasonably practicable to do so without waste, his just and equitable share of the oil or gas, or both, in the pool."

2. According to § 30–216(a), W.S.1957, C.1967, 1975 Cum.Supp.,

   "The term 'waste,' in addition to its ordinary meaning, shall include:

   "(1) The term 'waste' means and includes:
   "(1) Physical waste, as that term is generally understood in the oil and gas industry;
   "(2) The inefficient, excessive or improper use, or the unnecessary dissipation of, reservoir energy;
   "(3) The inefficient storage [of] oil or gas;
   "(4) The locating, drilling, equipping, operating, or producing of any oil or gas well in a manner that causes, or tends to cause, reduction in the quantity of oil or gas ultimately recoverable from a pool under prudent and proper operations, or that causes or tends to cause unnecessary or excessive surface loss or destruction of oil or gas;

   "(5) The production of oil or gas in excess of (a) transportation or storage facilities; (b) the amount reasonably required to be produced in the proper drilling, completing, or testing of the well from which it is produced, or oil or gas otherwise usefully utilized: Except gas produced from an oil well pending the time when with reasonable diligence the gas can be sold or otherwise usefully utilized on terms and conditions that are just and reasonable;
   "(6) Underground or aboveground waste in the production or storage of oil, gas, or condensate, however caused, and whether or not defined in other subdivisions hereof; and
   "(7) The flaring of gas from gas wells except that necessary for the drilling, completing or testing of the well.

   "(2) Repealed by Laws 1971, ch. 11, § 2.

   "(3) The drilling of any well not in conformance to a well density and spacing program fixed by the commission or other agency, state or federal, as to any field or pool during a national emergency when casing or other materials necessary to the drilling and operation of wells are rationed or in short supply."

*basic facts upon all of the material issues in the proceeding and upon which its ultimate findings of fact or conclusions are based. Unless that is done there is no rational basis for judicial review. Colorado-Wyoming Gas Co. v. Federal Power Commission, 324 U.S. 626, 65 S.Ct. 850, 89 L.Ed. 1235; California Motor Transport Co. v. Public Utilities Commission, 59 Cal.2d 270, 28 Cal.Rptr. 868, 379 P.2d 324, 326, 327; Cities Service Gas Company v. State Corporation Commission, 201 Kan. 223, 440 P.2d 660, 671; 2 Davis, Administrative Law Treatise, § 16.01, p. 436 (1958)."* [Emphasis supplied]

It is impossible for this court to discharge its appellate obligation of determining whether or not findings of fact are supported by the evidence, and lawful, logical and reasonable conclusions have been drawn, unless a detailed finding of fact on all the material issues is made by the administrative agency. We so held in *Pan American Petroleum*, supra, where the opinion says:

"To illustrate, one of the duties charged to courts, on review of agency action, is to ascertain whether or not such findings of fact are supported by substantial evidence. To afford the court an opportunity informatively and intelligently to discharge that function it must first be known what underlying evidentiary facts the agency relied upon for a finding or conclusion of ultimate facts. Findings of those basic facts will not be implied from ultimate findings. *Fallon v. Wyoming State Board of Medical Examiners*, Wyo., 441 P.2d 322, 327, rehearing denied 443 P.2d 135.[3] [Our footnote] As clearly pointed out in *California Motor Transport Co. v. Public Utilities Commission*, supra, 379 P.2d at 327, if that were not true there could be no assurance that an agency has made a 'reasoned analysis' of all the material evidence. The duty so imposed serves a further purpose. Ultimate facts can only 'be reached by a process of legal reasoning based on the legal significance to be afforded primary

evidentiary facts,' *Braun v. Ribicoff*, 3 Cir., 292 F.2d 354, 357; and it is the duty of the reviewing court to satisfy itself that an agency determination has been reached 'upon consideration of the whole record or such portion thereof as may be cited by any party,' as required by § 8(a) of the Act (§ 9–276.26(a), supra) on 'a reasonable basis in law.' *Braun v. Ribicoff*, supra. In other words, orderly review requires that the primary basic facts must be settled before it can be determined that ultimate facts found by an agency conform to law. Failure of an agency to meet its responsibilities in the premises makes its determination susceptible to the charge that the order entered is contrary to law."

Throughout these proceedings, appellants have been concerned about the direction of the drilling units established in the SE¼ of Section 24. They contended below, and contend here, that the horizontal spacing direction established by the Commission deprives them of their correlative rights in oil and associated hydrocarbons purported to exist in the SW¼SE¼ of Section 24. Their contention is premised, as previously mentioned, on a belief that substantial amounts of oil are being drained from the SW¼SE¼ by the well located in the NW¼SE¼, and that little or no oil is contributed by the government forty-acre tract in the NE¼SE ¼. Appellants' argument is one which is rooted in the theory of protecting correlative rights, but we find that the Commission's findings of fact make absolutely no mention of appellants' correlative rights. More specifically, such findings make no reference to the amount of recoverable oil under any of the tracts in the SE¼, or any other portion of Section 24. Additionally, the findings do not indicate the amount of oil that can be recovered *without waste*, as that phrase is defined by the statutes. The only finding which even approaches a consideration of these factors is Finding of Fact No. 19, which states:

"19. The Minnelusa 'A' sand in said field has produced 324,298 barrels of oil up to

---

**3.** See also *Geraud v. Schrader*, Wyo., 531 P.2d 872, 879; and *State Board of Equalization v.* *Kansas-Nebraska Natural Gas Co.*, Wyo., 457 P.2d 963.

May 31, 1974: 229,599 barrels from the Sherard 1–24 well in the N–SE¼ [sic] [should be N½SE¼] of Sec. 24; 58,586 barrels from the Carter 1–A in the S½ NW¼ of Section 24; 9400 barrels from the Peterson 1–24 well in the S½NE¼ of Section 24; and 26,713 barrels from the Wolff 1–24 well in the N½NE¼ of Section 24. Primary production to the economic limit of all Minnelusa 'A' sand wells in the field will be approximately 1.1 million barrels of oil representing ten (10) to fourteen (14) percent of the 'A' sand oil in place in the pool."

From this finding we know the approximate amount of oil that can be economically recovered from the pool, and can surmise that the greatest production comes from the well located in the NW¼SE¼ of Section 24. In addition, the Commission has found (1) that all of Section 24 is underlain by a reservoir containing a common accumulation of oil or gas, or both; (2) that there is no oil-water contact in any of the wells drilled in the Minnelusa formation "A" zone; and (3) that when the NW¼SE¼ well was tested the reservoir pressure declined, indicating communication between wells. Taking into account these determinations, it is, nevertheless, clear to this court that the Commission has wholly failed to make the requisite findings of fact required by law which would support its conclusion that the correlative rights of all interested parties will be protected by establishing eighty-acre spacing units along an East-West direction in the SE¼ of Section 24.

■■■ At a minimum, in order to determine the extent of the correlative rights in question, the Commission must establish: (1) the amount of recoverable oil in the pool; (2) the amount of recoverable oil under the various tracts; (3) the proportion that # 1 bears to # 2; and (4) the amount of oil that can be recovered without waste. See *Continental Oil Co. v. Oil Conservation Commission*, 70 N.M. 310, 373 P.2d 809. These findings were not made in this case. Without such findings, a reviewing court has no way to determine whether the owner of each property has been afforded the opportunity to produce without waste, so far

as it is reasonably practicable, his *just and equitable share* of the oil in the pool (§ 30–216(i)). In other words, it cannot determine whether correlative rights are being protected. As the court said in the *Continental Oil* case:

".  .  . That the extent of the correlative rights must be determined before the commission can act to protect them is manifest."

We will, therefore, require that the Commission make such findings, insofar as it is reasonably practicable to do so. Given the facts available, including the extent of drilling and production in Section 24 at the time of the hearing, we are unable to understand the administrative agency's failure to discharge these fact-finding obligations in this case.

Although we are unable to reach the merits of this case for reasons set out above, we, nevertheless, consider it advisable, in light of the fact that the matter must be remanded for further decision-making, to comment concerning legal standards which are apparently being misinterpreted or misapplied by the Commission. The findings of fact and conclusions of law relative to the eighty-acre spacing resolution carry with them strong overtones of a misunderstanding or misapplication on the part of the Commission of an important facet of the term "waste" as employed by the statute. The Commission's Conclusion of Law No. 8 provides that eighty-acre drilling units "will prevent or assist in preventing the various types of waste defined in the Oil and Gas Conservation Act." Concerning the word "waste," we call attention to Conclusion of Law No. 9, which says:

"The area herein spaced is fully developed and further wells are unnecessary to recover the oil in the Minnelusa 'A' sand pool. The drilling of additional wells in said pool would constitute *economic* and physical *waste*." [Emphasis supplied]

It would appear, then, that the Commission considers "economic waste" to be contemplated by the statutory definition of "waste" under § 30–216(a), supra. If this is indeed the Commission's position, and its decisions are being made with an economic-

waste factor ground into its ultimate conclusions, we find it to be erroneous in light of the legislative history which stands behind this provision of the statute. As originally introduced on January 25, 1951, this Section 15 of H.B. No. 130 provided:

> "(a) The term 'waste' in addition to its ordinary meaning, shall include: . . . (5) *the drilling of wells not reasonably necessary to effect an economic maximum ultimate recovery of oil or gas from a pool: . . . the drilling of unnecessary wells creates waste,* such as wells create fire and other hazards conducive to waste, *and unnecessarily increase production costs and thus also unnecessarily increase the costs of products to the consumer.*" [Emphasis supplied]

█ This language was rejected by the legislature and is not contained in the present § 30–216(a), supra. The rejection stands for the proposition that the legislature did not want economic matters considered. See 2A Sutherland, Statutory Construction, § 48.04 (4th ed. 1975). We could find no other reference to economic matters in the Oil and Gas Conservation Act. As a result, when the Commission makes an ultimate finding concerning waste, in this and similar considerations, it should do so only on the basis of the various types of waste enumerated in § 30–216(a), supra.[4]

We hasten to say that the technical decision, relative to correlative rights and waste, is not ours to make. Our function is only to determine whether the administrative decision meets the applicable legal standards and whether the facts of record are supportive of this decision. We are, however, unable to perform our function when the Commission fails to set forth the basic facts which underlie its ultimate conclusion. Certainly, there are other questions raised in this appeal which the parties desire to have answered, but we cannot reach them on some sort of a speculative basis until the Commission sets forth the foundation matters called for by this opinion.

For the reasons stated, the judgment of the district court is reversed with instructions to enter a judgment vacating the order of the Commission and remanding the proceeding to the Commission for further consideration consistent with this opinion.

Reversed with instructions.

See "Appendix A" on next page.

### ORDER

John H. Larsen, one of the appellants herein, having filed his Motion for Rehearing to Modify and Clarify Opinion, and appellant, Paul W. Sherard having joined therein; the court having examined this motion and the instruments filed in connection therewith and having considered the matter, and it appearing that the determinations sought will be more properly considered and answered when The Oil and Gas Conservation Commmission of the State of Wyoming shall have completed its proceedings and made appropriate findings and order therein so that the record is complete;

IT IS ORDERED that said motion to modify and clarify be, and the same is hereby, denied.

---

4. We note that the Commission is presumed to be aware of this possible interpretation, since it is essentially the same as the Memorandum Opinion rendered by its own Special Assistant Attorney General. See Practice Before the Wyoming Oil and Gas Conservation Commission, Volume X, No. 2, 1975, Land and Water Law Review 353, 403–409, where Special Assistant Attorney General Sutton, in referring to the rejection of the economic-waste language of the original H.B. 130, said:

> ". . . The rejection of this language indicates a very clear statement by the legislature that economic matters may not be considered by the Wyoming Oil and Gas Commission in spacing matters."

When utilizing the term "economic waste," we do so in the same context used in the Memorandum Opinion of Special Assistant Attorney General Sutton at page 403, where he says in a footnote on that page:

> "In this opinion, when referring to 'economics' the reference relates to the economic position of oil and gas producers and their internal financial ability or inability to drill all of the well locations required by any given spacing order. Or stated differently, whether well spacing must be determined by the financial ability of producers to drill wells or by principles of conservation as defined by the conservation act."

APPENDIX "A"

R 71 W   R 70 W

NORTHWEST TIMBER CREEK FIELD (ABND)

SMITH

SMITH

TORO

TORO   COOK

USA

WOLFF   WOLFF   COOK   COOK   USA

WOLFF   WOLFF   COOK   COOK   FED

WOLFF   LE SUEUR   LE SUEUR   LE SUEUR   LE SUEUR

TIMBER CREEK FIELD

LE SUEUR   LE SUEUR   LE SUEUR

LE SUEUR

LE SUEUR

WOLFF

SOLOMON

NORTH RAINBOW RANCH FIELD

WOLFF   WOLFF

CARTER   PETERSON

CARTER   SHERARD   SHERARD

FED

SHERARD

SPACED AREA OUTLINE

CARTER

GOVT

# NORTH RAINBOW RANCH FIELD

CAMPBELL COUNTY, WYOMING

T 49 N

## LEGEND

- OIL WELL - MUDDY FM
- DRY IN MINNELUSA - OIL WELL IN MUDDY
- OIL WELL - MINNELUSA FM
- DRY HOLE - SHALLOW
- DRY HOLE - MINN
- ABANDONED OIL WELL - MUDDY
- ABANDONED OIL WELL - MINN.

Spacing Units

Aquarius
Resources
Corporation

SCALE
0   1/4   1/2   3/4   1 Mi