The ANSCHUTZ CORPORATION, Appellant (Petitioner),

v.

The WYOMING OIL AND GAS CONSER-VATION COMMISSION; and Union Pa-cific Resources Company, Appellees (Re-spondents).

No. 95–279.

Supreme Court of Wyoming.

Sept. 16, 1996.

Neil J. Short, Casper, for appellant petitioner The Anschutz Corporation.

William U. Hill, Attorney General; Roberta L. Rinegar, Assistant Attorney General, for appellee respondent Wyoming Oil and Gas Conservation Commission.

Jack D. Palma, II, P.C., and Lynnette J. Boomgaarden of Holland & Hart, Cheyenne, for appellee respondent Union Pacific Resources Company.

Before GOLDEN, C.J., and THOMAS, MACY, TAYLOR,* and LEHMAN, JJ.

GOLDEN, Justice.

The Anschutz Corporation (Anschutz) appeals from the Wyoming Oil and Gas Conservation Commission's (Commission) compulsory pooling order entered in Docket 183–95, pooling Anschutz's non-consenting interest with all consenting interests in the proposed UPRC 11–3 well in the Yellow Creek Field. We affirm.

## ISSUES

Appellant Anschutz presents the following issues:

1. Whether the force pooling order entered in Docket No. 183–95 violated the correlative rights of the Anschutz Corporation.

2. Whether the force pooling order entered in Docket No. 183–95 is fatally defective because it is based upon a "temporary" spacing order which does not honor the best available scientific data and thus cannot support a force pooling order.

3. Whether findings of fact nos. 12 and 13 in the order in Docket No. 183–95 regarding industry practice and procedure are supported by a rational basis found in the record and by a conscious and explicit statement of the underlying facts supporting the findings.

4. Whether the order entered in Docket No. 191–80 as reviewed and continued by a series of orders most recently embodied in Docket No. 122–95 presented a justiciable issue and controversy that was ripe for determination at any time prior to the filing of the UPRC application for force pooling on May 18, 1995.

In its brief of Appellee, the Commission presents the issues as follows:

I. Whether the Wyoming Oil and Gas Conservation Commission order to force pool Anschutz' interests in the Phosphoria and Weber formations in an established drilling and spacing unit conforms with law and is supported by substantial evidence.

II. Whether Appellant, Anschutz Corporation, is estopped from contesting the Commission's findings, conclusions and order.

Finally, Appellee Union Pacific Resources Company (UPRC), the interest owner applying for the force pooling order, states the issues as:

1. Whether the Wyoming Oil and Gas Conservation Commission's ("Commission" or "WOGCC") Order in Docket No. 183–95 ("compulsory pooling order") is within that agency's statutory authority and consistent with applicable law. [footnote omitted]

a. Whether the WOGCC's compulsory pooling order protects correlative rights.

b. Whether a temporary order establishing drilling units can serve as the basis for compulsory pooling.

2. Whether there is substantial evidence in the record to support the WOGCC's compulsory pooling order.

## FACTS

In 1980, Amoco Production Company (Amoco) petitioned the Commission to establish drilling and spacing units for its interests in the Yellow Creek Field in southwest Wyoming (Docket No. 191–80). There are several strip sections on the Wyoming–Utah border in this area, causing some difficulty in establishing drilling and spacing units. Anschutz is a working interest owner in Section 10 of Township 14 North, Range 121 West, 6th P.M., Uinta County, Wyoming, which is a strip section with only 92.84 acres. Anschutz contested Amoco's request for drilling and spacing units in order to protect its interest in Section 10. Ultimately, however, Anschutz and the other interest owners compromised on and agreed to drilling and spacing units of approximately 640 acres suggested by the Commission. After determining that the Phosphoria Formation underlies all or

* Chief Justice effective July 1, 1996.

substantially all of the above-described lands and is a pool which constitutes a common source of supply of gas and associated hydrocarbons, the Commission issued an order creating Phosphoria Drilling Unit No. 5 and several other drilling units for the production of gas and associated hydrocarbons in the Phosphoria Formation in the Yellow Creek Field. Phosphoria Drilling Unit No. 5 consists of all of Section 10 and the westernmost 593.58 acres of Section 11 in Township 14 North, Range 121 West, Uinta County, Wyoming, in the Phosphoria Formation. Later, the Commission established a drilling and spacing unit for the production of gas and associated hydrocarbons from the Weber Formation under the same lands. This drilling and spacing unit was called Weber Drilling Unit No. 7. Phosphoria Drilling Unit No. 5 and Weber Drilling Unit No. 7 are the units at issue in this case.

The Commission's order in Docket No. 191–80 was temporary until November, 1981, at which time it could be reviewed by the Commission for possible amendment pursuant to WYO. STAT. § 30–5–109(d). The Commission ordered Amoco to furnish maps and other evidence of drilling activity for the intervening period. Thereafter, the Commission continued to review its order periodically. However, no wells were drilled in the area, and the Commission received no information about the area with which to further define the pool pursuant to WYO. STAT. § 30–5–109(d). Therefore, the order remained temporary and subject to review by the Commission.

UPRC purchased Amoco's interest in the Yellow Creek Field in 1991. In 1995, UPRC notified the Commission that it was going to apply for a permit to drill a well located in Section 11, Township 14 North, Range 121 West. In Docket No. 122–95, the Commission reviewed evidence and conducted a study of the field from the records in the office of the State Oil and Gas Supervisor and determined that the drilling and spacing units should be maintained for the Weber and Phosphoria Formations. The spacing order was again temporary and required UPRC to furnish the Commission with maps and other evidence portraying the drilling

activity taking place from April 1995 until April 1996.

In 1995, UPRC petitioned the Commission for an exception location (Docket No. 184–95) on the drilling and spacing unit and for a force pooling order (Docket No. 183–95) pursuant to WYO. STAT. § 30–5–109. Anschutz is a non-consenting interest owner in the drilling unit and contested the petitions. The Commission denied the exception location as it affected Anschutz but granted the force pooling petition. The Commission also found that it was not possible to accurately define the parameters of the Phosphoria and Weber formations underlying the subject lands or to determine the reserves underlying Sections 10 and 11 with any degree of certainty, due to the limited geological, geophysical, and engineering data available. The Commission allocated costs and production in the drilling and spacing unit based on the percentage that each tract's surface acreage bears to the total surface acreage of the drilling and spacing unit.

Anschutz perfected an appeal from the order in Docket No. 183–95 under WYO. R.APP. P. 12 and WYO. STAT. § 16–3–114 by filing a petition for judicial review in district court. The district court certified the case to this Court pursuant to WYO. R.APP. P. 12.09.

## STANDARD OF REVIEW

██ This Court's function in reviewing administrative agency decisions is to determine whether the decision and order meet the applicable legal standards and are supported by substantial evidence in the record. *Larsen v. Oil and Gas Conservation Comm'n,* 569 P.2d 87, 93 (Wyo.1977). We examine conflicting evidence to determine if the Commission could reasonably have made its findings and order upon all of the evidence before it. *Gilmore v. Oil & Gas Conservation Comm'n,* 642 P.2d 773, 776 (Wyo. 1982). "If an agency's action is supported by substantial evidence, its decision should be reversed only for errors of law." *Chevron U.S.A., Inc. v. State of Wyoming Board of Equalization,* 918 P.2d 980, 983 (Wyo.1996).

██ This Court does not defer to an agency's conclusions of law. *Id.* However,

technical decisions relative to waste and correlative rights are for the Commission, as the trier of fact, not the court, to decide. *Larsen*, 569 P.2d at 93; *Pan American Petroleum Corp. v. Wyoming Oil & Gas Conservation Comm'n*, 446 P.2d 550, 554 (Wyo.1968). We may not substitute our judgment for that of the Commission. *Gilmore*, 642 P.2d at 776.

## DISCUSSION

■ "In 1951, the legislature enacted the Oil and Gas Conservation Act, WYO. STAT. §§ 30–5–101 to 30–5–104 and §§ 30–5–108 to 30–5–119 (1983 & Cum.Supp.1994) (hereinafter the Act) to regulate the oil and gas industry in the state." *Union Pacific Resources Co. v. Texaco, Inc.*, 882 P.2d 212, 222 (Wyo.1994). The Act established the Commission, giving it jurisdiction and authority necessary to effectuate the purposes and intent of the Act. *Id.* at 223; *see also* WYO. STAT. §§ 30–5–103, –104(a) (1983 & Cum. Supp.1996). "Our reading of the Act discloses that the purpose is to provide a comprehensive regulatory program which prevents the waste of Wyoming's oil and gas resources and protects the correlative rights of property owners. WYO. STAT. § 30–5–102; WYO. STAT. § 30–5–109." *Union Pacific*, 882 P.2d at 223. The correlative rights granted by the Act are limited by the need to prevent waste. *Big Piney Oil & Gas Co. v. Wyoming Oil & Gas Conservation Comm'n*, 715 P.2d 557, 563 (Wyo.1986); *Union Pacific*, 882 P.2d at 224; *Gilmore*, 642 P.2d at 778.

■ The Commission has broad authority to establish drilling units to prevent or assist in the prevention of waste or to protect correlative rights. *Union Pacific*, 882 P.2d at 224; WYO. STAT. § 30–5–109(a) (1983). The Commission must first make a sufficient finding that a drilling unit is necessary to protect correlative rights or prevent waste, then it may issue a compulsory pooling order, if necessary. *Union Pacific*, 882 P.2d at 224. Once a drilling unit is established, the Commission has continuing authority to modify its orders to ensure that the drilling unit is not smaller than the maximum area that can be efficiently drained by one well. *Id.* at 224–25; WYO. STAT. § 30–5–109(b), (d) (1983). When data is developed that establishes the extent of the common source of supply, the Commission has authority to protect the public interest by increasing or decreasing the size of drilling units. *Union Pacific*, 882 P.2d at 225.

■ If tracts of land or mineral interests within a drilling unit are separately owned, the Act requires another step, either voluntary or compulsory pooling, before exploitation of the minerals may commence. *Id.*

> In the absence of voluntary pooling, the commission, upon the application of any interested person, may enter an order pooling all interests in the drilling unit for the development and operation thereof. Each such pooling order shall be made after notice and hearing and shall be upon terms and conditions that are just and reasonable.

WYO. STAT. § 30–5–109(f) (1983). The Commission has authority to apportion production, allocate costs, and make provisions for the drilling and operation of a well when a compulsory order is issued. *Union Pacific*, 882 P.2d at 227; WYO. STAT. § 30–5–109(f) and (g) (1983).

Anschutz argues that its correlative rights are being violated because the Commission based production and costs for the proposed well on a surface acreage formula. Anschutz relies on *Larsen v. Oil and Gas Conservation Comm'n*, 569 P.2d 87 (Wyo.1977), and *Pan American Petroleum Corp. v. Wyoming Oil and Gas Conservation Comm'n*, 446 P.2d 550 (Wyo.1968), to argue that the Commission must make the findings set out in *Larsen* and must base compulsory pooling orders on a scientific determination of the amount of recoverable gas under the drilling unit and not on a surface-acreage basis. Anschutz' reliance on *Larsen* and *Pan American* is misplaced. In those cases the Commission failed to make specific findings of fact concerning the correlative rights of the parties even though it had information and production data about the field available to it because the field had been drilled extensively. *Larsen*, 569 P.2d at 92, *Pan American*, 446 P.2d at 555. In this case the field has not been subject to extensive drilling; in fact, no

well has been drilled in the area. Unlike the Commission in *Larsen* and *Pan American*, the Commission in this case found it did not have sufficient production data available to calculate reserves accurately because no wells have been drilled in the area.

■ Anschutz claims that the Commission ignored its obligations and disregarded the best available scientific information regarding the common source of supply in its pooling order. However, the Report of the Commission specifically addressed the scientific information available and made findings of fact and conclusions of law which were supported by the record when it found:

6. Subject lands are in a geologic area in the Overthrust Belt containing steep dips, folds, faults, pressure boundaries and stratigraphic changes. The structure of the Phosphoria underlying subject lands is characterized by a faulted and imbricated east flank which is particularly complex. The presence of a Fowkes Valley tertiary wedge and a graben or half graben further complicates the definition of the eastern flank of the reservoir. The area is very unpredictable; small structural complications can have profound geologic significance.

7. The Anschutz interpretation of the formations' structure and reserves underlying subject lands concludes that a large portion of Section 11 is unproductive and that strip Section 10 is entitled to a participation percentage in the 11–3 well of either 66.86% or 31%, depending on whether or not the well, once drilled, penetrates the lower blocks of the formations. These conclusions are based upon all available well control data, a series of serial cross sections (one of which is in the area of the Cave Creek Field which is about six miles from the Yellow Creek Field), and projections by analogy to geologic data from other areas, including the structural geometry of the Carter Creek Field which is about twenty miles from the Yellow Creek Field, and from the Anschutz Ranch Field which is approximately ten miles from the Yellow Creek Field.

There are currently no wells which penetrate the Phosphoria formation in subject lands; the 11–3 well will be the first to penetrate the formation. There is no well control data to support Anschutz' interpretation of the formations and the reserves underlying subject lands. Anschutz' calculation of reserves is based upon volumetrics, not upon more accurate production data from existing wells in the Yellow Creek area (other than the Urroz No. 1), because there is not sufficient production data presently available to calculate reserves.

8. UPRC's structural interpretation of the formation underlying subject lands is based upon existing well control and its reprocessed and new seismic data (UPRC Exhibit No. 4, Docket No. 184–95). A UPRC witness testified that 25% of Section 11 is below the gas/water contact if his interpretation of the data as shown on Exhibit 4 is correct, though there is still difficulty with the seismic and there are internal complexities within the formation, especially along the eastern flank, that are not resolvable through interpretation of the data. UPRC's interpretation of the structure has a 500' margin of error, to either the east or the west, at a 12,000' depth, according to testimony of a UPRC witness. Only a time migration was used to image the data on the seismic lines; UPRC is in the process of creating a depth migration.

9. If the axis of the Phosphoria formation shifts and the structure's crest is actually more toward the southeast of Section 11, the reserves credited to Section 11 could increase under either geologic interpretation presented, though this cannot be known until a well is actually drilled.

10. It is not possible to define the exact parameters of the Phosphoria and Weber formations underlying subject lands, especially on the eastern flank, nor is it possible to identify the reserves underlying Sections 10 and 11 with any degree of certainty due to the limited geological, geophysical, and engineering data now available. There are too many unknowns about the internal complexities of the structure to accept either of the interpretations presented. These uncertainties will only be

clarified by drilling a well that penetrates the formations and studying the data which such a well will provide.

The exceedingly complex and technical nature of the above findings of fact accentuates the need for this Court to defer to an administrative agency's factual determinations. We are ill-equipped to determine whether the Commission correctly analyzed and weighed the evidence presented to it. However, we are equipped to examine the record and recognize that the experts from both Anschutz and UPRC testified that the only way to obtain accurate information about the field is to drill a well.

▌▌▌▌ Anschutz claims that the Commission must fulfill the duties imposed by *Larsen* before it can issue a force pooling order and that a temporary spacing order cannot support a force pooling order. As we mentioned earlier, *Larsen* is distinguishable from this case because the data was available to the Commission and the Commission simply failed to make findings of fact concerning correlative rights in *Larsen.* In this case no accurate data was available to the Commission and it issued its orders using the best available evidence. WYO. STAT. § 30–5–109(f) provides that the Commission may enter an order pooling all interests in a drilling unit for the development and operation thereof and that each pooling order shall be upon terms and conditions that are just and reasonable. The Commission is only required to make the findings in *Larsen* "insofar as it is reasonably practicable to do so." *Larsen,* 569 P.2d at 92. When it is not practicable to determine reserves under each tract, it is reasonable to use a surface acreage formula allocating production. *Grace v. Oil Conservation Comm'n of New Mexico,* 87 N.M. 205, 531 P.2d 939, 945–46 (1975); *Panhandle Eastern Pipe Line Co. v. Corporation Comm'n,* 285 P.2d 847, 854 (Okla.1955). In fact, surface acreage is perhaps the most frequently employed basis for allocating pooled production. 6 H. WILLIAMS & C. MEYERS, OIL AND GAS LAW § 970.1 (1991 & Supp. 1995).

▌▌▌ "[C]orrelative rights must stand aside until it is practical to determine the amount of gas underlying each producer's tract or in the pool." *Grace,* 531 P.2d at 946; *see also* WYO. STAT. § 30–5–101(a)(ix) (1983).[1] The minimum requirement for force pooling is a valid drilling and spacing order, which determines that the acreage within the unit is not smaller than the maximum area that can be effectively drained by one well in a common source of supply. WYO. STAT. § 30–5–109(a), (b), (f) (1983). Although more certain proof of productivity is desirable, and should be furnished when available, it is not a requirement before a force pooling order can be issued, as long as the pooling order is just and reasonable. WYO. STAT. § 30–5–109(f) (1983).

The Commission's authority to order pooling of interests in previously undrilled and undeveloped formations encourages the development of fields and the drilling of wells, thereby preventing waste. WYO. STAT. § 30–5–109(f) and (g) encourage parties to consent to the drilling of wells because of the obvious risks involved in drilling for oil and gas. If the Commission could not force pool nonconsenting interests until a field or pool were well-defined, far fewer wells would be drilled, resulting in waste. Contrary to Anschutz' contentions, nothing in the Act suggests that the Commission can only force pool interests in developed fields with well-defined reserves. WYO. STAT. § 30–5–109 (1983).

Anschutz also argues that the Commission's findings of fact numbered 12 and 13 in Docket No. 183–95 regarding industry practice and procedure are not supported by a rational basis in the record. Those findings of fact were as follows:

12. It is a standard practice of the Commission to order the pooling of uncommitted interests on the basis of temporary drilling and spacing unit orders, in the absence of voluntary pooling, to aid in the definition of reservoirs through the drilling

---

1. Wyoming Statute § 30–5–101(a)(ix) defines correlative rights as:

   [T]he opportunity afforded the owner of each property in a pool to produce, so far as it is

reasonably practicable to do so without waste, his just and equitable share of the oil or gas, or both, in the pool.

of wells and the development of the formations.

13. It is an accepted procedure in the oil and gas industry and a long-standing practice of the Commission when ordering pooling to encourage the development of previously undrilled formations to allocate costs and production in drilling and spacing units upon a tract participation factor based on the percentage that each tract's surface acreage bears to the total surface acreage of the drilling and spacing unit if there is inadequate information to determine the parameters of the formations and the reserves underlying each tract with any degree of factual accuracy or certainty. This procedure and practice was utilized by UPRC in its determination of the drilling and spacing unit's cost-bearing ownership.

These findings are based on the Commission's standard practice and are not violative of the Act. In fact, the Commission is clearly given statutory authority to change drilling and spacing units when drilling produces more information about the parameters of the formation. WYO. STAT. § 30–5–104, – 109(d) (1983 & Cum.Supp.1996). The Commission is also clearly given the authority to pool interests in a drilling and spacing unit in a manner that is just and reasonable. WYO. STAT. § 30–5–109(f) (1983). We hold that the Commission acted within its authority in this case.

## CONCLUSION

The Commission's force pooling order is supported by substantial evidence, is based on the best evidence available and will prevent waste and protect correlative rights to the extent reasonably practical until the field is further developed and more accurate information becomes available. The Commission did not violate its duty under the Act by force pooling the interests under a common source of supply, or pool, as established in its drilling and spacing unit orders.