W.A. MONCRIEF, Jr., Appellant
(Petitioner),

v.

WYOMING OIL AND GAS CONSERVA-
TION COMMISSION; and Barrett Re-
sources Corporation, Appellees (Respon-
dents).

No. 98–245.

Supreme Court of Wyoming.

May 28, 1999.

Craig Newman of The Law Office of Craig Newman, Casper, Wyoming, for Appellant.

Gay Woodhouse, Acting Attorney General; and Roberta L. Rinegar, Senior Assistant Attorney General, for Appellee Wyoming Oil and Gas Conservation Commission.

William A. Keefe and Malcolm M. Murray of Gorsuch Kirgis LLP, Denver, Colorado, for Appellee Barrett Resources Corporation.

Before LEHMAN, C.J., and THOMAS, MACY, GOLDEN and HILL, JJ.

MACY, Justice.

Appellant W.A. Moncrief, Jr. (Moncrief) petitioned for a review of the order in which Appellee Wyoming Oil and Gas Conservation Commission (the commission) approved the application filed by Appellee Barrett Resources Corporation (Barrett) for an order from the commission establishing a single 320–acre drilling and spacing unit. The district court certified the case to the Wyoming Supreme Court.

We affirm the commission's order.

## ISSUES

In his petition for review, Moncrief stated the following issues:

1. Whether under the provisions of the Wyoming Oil and Gas Conservation Commission Act, WYO. STAT. ANN. § 30–5–101 *et seq.*, the Decision is in excess of statutory and regulatory jurisdiction, contrary to law, lacking in statutory right, arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law, and unsupported by substantial evidence in granting Barrett Resources Corporation's application for the establishment of a 320–acre drilling and spacing unit for the Frontier, Muddy, Lakota, Sundance and Morrison Formations given the evidence submitted by Barrett Resources Corporation and the record of the proceeding before the [Wyoming Oil and Gas Conservation Commission].

2. Whether the Decision is in excess of statutory and regulatory jurisdiction, contrary to law, lacking in statutory right, arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law, and unsupported by substantial evidence in finding, as required by WYO. STAT. ANN. § 30–5–109(b), that 320 acres is "not smaller than the maximum area that can be efficiently drained by one well" drilled to each of the Frontier, Muddy, Lakota, Sundance and Morrison Formations given the evidence submitted by Barrett Resources Corporation and the record of the proceeding before the [Wyoming Oil and Gas Conservation Commission].

Moncrief defined the issues more specifically in his brief on appeal to state the following:

1. Did the Commission err in creating a 320–acre drilling unit for five separate hydrocarbon pools when the sole evidence by the applicant justifying the 320–acre size ... drilling unit requested consisted of a computer simulation which omitted entirely three of the five formations in question, erroneously included one formation not actually productive in the single well used to construct the computer simulation, did not include actual properties of one of the formations available to the modeler, and was otherwise not representative of the geology of the area under consideration and when other evidence before the Commission as to two of the five formations in question declared that 320 acres is smaller than the maximum area which can be efficiently drained by one well?

2. Is the Commission's Decision in error in creating a 320–acre drilling unit when previously created drilling units for the same pools immediately adjacent to the requested 320–acre drilling unit are twice as large, thereby rendering the 320–acre drilling unit in question not of "approximately uniform size" as required by Wyo. Stat. Ann. 30–5–109(a)?

3. Is the Commission's Decision impermissibly based upon the vast sums of money being expended and proposed to be expended by Respondent Barrett in the area under consideration when compared to the slower and less densely drilled exploration pace suggested by Appellant and the other party to the proceeding below which would involve nominally one-half the drilling dollars proposed by the Respondent Barrett?

## FACTS

In February of 1998, Barrett filed an application for an order establishing a 320–acre drilling and spacing unit on the east half of Section 19, Township 37 North, Range 86 West, 6th P.M., Natrona County, for the Frontier, Muddy, Lakota, Sundance, and Morrison Formations (subject formations).

Moncrief and Chevron U.S.A., Inc. (Chevron) objected to Barrett's application.

The requested drilling and spacing unit was the fourth unit to be established for the subject formations in the Waltman Field (Cave Gulch Area). The first spacing unit, which was established on the south half of Section 29 and the north half of Section 32, covered 640 acres. The second spacing unit, which was established on the south half of Section 20 and the north half of Section 29, also covered 640 acres. The third spacing unit, which was a vertical 320–acre unit located west of and adjacent to the adjoining halves of the two 640–acre units, was established on the east half of Section 30. The drilling and spacing unit at issue in this appeal is a 320–acre vertical unit located directly north of the previously established 320–acre vertical unit. The following map depicts the spacing units which have been established in the Waltman Field:

A Portion of Township 37 North,

Range 86 West, 6th P.M., Natrona County, Wyoming

The commission heard this matter on March 10, 1998, and approved Barrett's application, reserving jurisdiction to take additional action as it deemed necessary and proper. Moncrief filed a petition in the district court for a review of the commission's order, and the district court certified the case to the Wyoming Supreme Court pursuant to W.R.A.P. 12.09(b).

### STANDARD OF REVIEW

■ When we are reviewing cases that have been certified to us pursuant to W.R.A.P. 12.09(b), we apply the appellate standards which are applicable to a reviewing court of the first instance. *Weaver v. Cost Cutters*, 953 P.2d 851, 854 (Wyo.1998). W.R.A.P. 12.09(a) limits judicial review of administrative decisions to a determination of the matters specified in Wyo. Stat. Ann. § 16–3–114(c) (Michie 1997).

■ When this Court reviews an administrative agency decision, our job is to determine whether the decision meets the applicable legal standards and is supported by substantial evidence in the record. *Anschutz Corporation v. Wyoming Oil and Gas Conservation Commission*, 923 P.2d 751, 754 (Wyo.1996). Our function is to examine the conflicting evidence to determine whether the commission reasonably based its findings and decision upon all the evidence which was

before it. *Id.* Technical decisions relative to the waste of oil and gas resources, however, are for the commission, as the trier of fact made up of experts in the field, to make and not for this Court to decide. 923 P.2d at 757; *Larsen v. Oil and Gas Conservation Commission,* 569 P.2d 87, 93 (Wyo.1977); *Pan American Petroleum Corporation v. Wyoming Oil and Gas Conservation Commission,* 446 P.2d 550, 554 (Wyo.1968). "Our function is only to determine whether the administrative decision meets the applicable legal standards and whether the facts of record are supportive of this decision." *Larsen,* 569 P.2d at 93.

## DISCUSSION

"In 1951, the legislature enacted the Oil and Gas Conservation Act, Wyo. Stat. §§ 30–5–101 to 30–5–104 and §§ 30–5–108 to 30–5–119 (1983 & Cum.Supp.1994) ... to regulate the oil and gas industry in the state." *Union Pacific Resources Company v. Texaco, Inc.,* 882 P.2d 212, 222 (Wyo.1994). The act created the commission and gave it the necessary jurisdiction and authority to effectuate the purpose of the act, which is to provide a comprehensive regulatory program to prevent the waste of Wyoming's oil and gas resources and to protect the correlative rights of property owners. 882 P.2d at 222–23; Wyo. Stat. Ann. §§ 30–5–102, –104(a), –109 (Michie 1997).

The commission possesses the authority, in establishing drilling units, to prevent waste and to protect correlative rights. *Union Pacific Resources Company,* 882 P.2d at 224; § 30–5–109(a). Once a drilling unit has been established, the commission has continuing authority to modify its orders to ensure that the drilling unit is not smaller than the maximum area that can be efficiently drained by one well. *Union Pacific Resources Company,* 882 P.2d at 224–25; § 30–5–109(b), (d). When data is developed which establishes the extent of the common source of supply, the commission has authority to protect the public interest by increasing or decreasing the size of a drilling unit. *Union Pacific Resources Company,* 882 P.2d at 225.

## A. Substantial Evidence

The issue before the commission was whether a 320–acre drilling and spacing unit was an appropriately sized unit for the subject formations. Section 30–5–109(b) provides:

In establishing a drilling unit, the acreage to be embraced within each unit and the shape thereof shall be determined by the commission from the evidence introduced at the hearing but shall not be smaller than the maximum area that can be efficiently drained by one (1) well.

Moncrief contends that the commission's order in this case is legally and factually erroneous because the only basis for the finding that 320 acres is not smaller than the maximum area which can be efficiently drained by one well is a flawed computer reservoir simulation. Moncrief maintains that the computer simulation did not include three of the five formations involved, erroneously modeled a formation which was not productive in the single well utilized for the model, did not include actual porosity values significantly higher than those input by the modeler, and was otherwise flawed. Moncrief contends that this Court's decision in *Larsen,* 569 P.2d 87, requires that considerable effort be made to quantify the oil and gas that will be produced from the whole pool and from each separate tract "insofar as it is reasonably practicable to do so." Moncrief maintains that, because Barrett did not perform or present any calculation or attempt to quantify the drainage area of any well other than by using a flawed computer simulation, it failed to prove that 320 acres is not smaller than the maximum area which can be efficiently drained by one well.

The appellees counter that § 30–5–109(b) does not require that the evidence for establishing a drilling unit be of any particular type. They claim that the only requirement is that the evidence be relevant evidence which reasonable minds can accept as being adequate to support the commission's order. They assert that the commission did not rely upon the computer model and that substantial evidence was presented in addition to the computer model which supported the commission's order.

In *Larsen*, we reversed the order establishing drilling units on the basis that the commission failed to make specific findings of fact concerning the correlative rights of the parties even though information and production data about the field was available because the field had been extensively drilled. 569 P.2d at 92. Under *Larsen*, Barrett was required only to predict the quantity of oil and gas that would be produced from the whole pool and from each separate tract insofar as it was reasonably practicable to do so. *Id.* The case at bar presents a different situation because the field at issue here was in the early stages of development. The fact that this field had not been fully developed, coupled with the complex geology of the field, made predicting the amount of oil and gas which would be produced extremely difficult.

At the hearing, Barrett presented four witnesses: a geologist, a scientist who was an expert in petroleum engineering, a senior engineer who was also an expert in petroleum engineering, and a landman. The geologist presented a structure map of the area which had been created from drilling information on area wells and a twenty-two-square-mile three dimensional (3–D) seismic survey. He explained that the map was developed as a result of an unusually thorough integration of the 3–D seismic data with the production and well log data accumulated from eight wells in the vicinity. He informed the commission that the structure map was slightly different from the one that was presented in a previous application hearing because he now had significant information from two additional wells which showed that the crest of the structure was located slightly more west. The revised map also showed a north-south running trending fault splitting Sections 29 and 30. As a result, the geologist concluded that the west half of Section 19 would not be productive.

The geologist used well log data and production information, along with core information, to characterize the geological nature of the reservoirs in the subject formations. He stated that the Muddy Formation has good porosities and permeabilities but that it is a discontinuous channel sand which is not consistently productive. The geologist characterized the other four subject formations as tight gas sands which means that they possess extremely low porosities and permeabilities.[1] In addition, he testified that core information indicated that there was significant quartz cementation, as well as pore-plugging clays in the pore spaces of the rocks, which further reduces indicated porosities and permeabilities and that, because these formations are at extreme depths—18,000 to 22,000 feet, the enormous overburden further reduces porosity and permeability. He also identified a number of vertical fractures in the cores from well log interpretations which could allow formations to produce even though they lack adequate porosity and permeability.

The geologist concluded that, although the Muddy Formation has greater porosities and permeabilities, it is a discontinuous channel sand. He also determined that the only way the other subject formations could produce would be by way of the fracture systems in the rocks because observed porosities and permeabilities in the matrices would not allow these formations to produce. As a result, he testified that there is an overall extreme amount of heterogeneity and discontinuity[2] in these tight gas formations.

The scientist's testimony supported the geologist's testimony. He presented the

---

1. Porosity is the total volume of open spaces, pores, or voids in a rock or sediment. Permeability refers to the relative ease with which a fluid moves through porous media. *See* Webster's New World Dictionary (2d college ed. 1972).

2. During the oral argument in this matter, Moncrief's counsel stated that the term heterogeneity meant

> that, while [a] formation may be encountered [under two] well bores some distance apart from one another, somehow in between well

> bore A, which produces from this formation, and well bore B, something has happened in the productive character qualities of the sand and so that it produces in well bore A and, while present in well bore B, it somehow has lost its productive qualities or is marginally productive.

He also stated that the term discontinuity means a formation "somehow is present in well bore A but isn't found at all in well bore B at some lateral distance removed."

computer simulation with which Moncrief takes issue. He also testified about his involvement with the MWX project in the late 1970's and 1980's which was a multi-well, multi-discipline study funded by the Department of Energy on the behavior of gas in the western tight gas sands to determine what mechanisms would permit the production of gas from these types of formations. He testified that it is fracture systems in these tight gas formations which allow the production of gas. He stated that these fracture systems are irregular and show a high degree of heterogeneity which causes tight gas sands to not behave in the same manner as more conventional reservoirs that rely on much higher porosity and permeability to allow the movement of fluids to the well bore. The scientist concluded from the early production declines in the wells already drilled in the Cave Gulch Area, the existence of natural fractures in the cores, and the heterogeneities in the reservoirs that it is unlikely that wells will drain a large area. Barrett's other petroleum engineering expert agreed that, on the basis of his analysis of the information available, the proposed well would not drain more than 320 acres.

Moncrief did not present any geological testimony, and Chevron's geologist—whose testimony focused almost exclusively on the location of the fault—advocated a 640–acre drilling unit even though he did not have persuasive data to support his opinion. Moncrief's petroleum engineering expert testified that, on the basis of his analysis of two wells in the vicinity of the proposed well, the Frontier and Lakota Formations could be produced on 640–acre spacing. He conceded that Moncrief did not take issue with the 320–acre spacing for the Muddy Formation. None of Moncrief's or Chevron's witnesses contested the conclusion that the formations, other than the Muddy Formation, were tight gas sands, nor did they challenge the conclusion that tight gas sands exhibit an extreme degree of heterogeneity and discontinuity.

■ We have stated before that the complex and technical nature of these types of cases requires this Court to defer to the administrative agency's factual determinations. *Anschutz Corporation*, 923 P.2d at

757; *Larsen*, 569 P.2d at 93; *Pan American Petroleum Corporation*, 446 P.2d at 554. The ultimate weight of the evidence and the credibility of the witnesses are to be determined by the commission "in the light of the expertise and experience of its members in such matters." *Pan American Petroleum Corporation*, 446 P.2d at 554.

■ The commission found that the subject formations are complex, tight gas reservoirs with very low permeabilities and porosities, particularly in the Frontier and Lakota Formations. It also found that the Muddy Formation has relatively higher permeabilities but that it is extremely discontinuous. It ultimately concluded that a 640–acre drilling unit would not be prudent. The record supports this decision. It contains extensive geologic evidence, including structure maps; cross sections; seismic interpretation; permeability, porosity, and fracture analyses; well logs; and completion, testing, and production information from numerous wells. The commission seemed satisfied that Barrett presented the best available evidence to enable it to make an informed decision. One commissioner commented:

We, I think, have seen with analogs and core photographs and a lot of detailed information, I think some very, very excellent geologic data. I think it's exceptional.

I think that data goes on to say that they are trying to explain about tight sands and that tight sands do respond critically to water saturations and the overburden. I think at these kinds of depth, I certainly believe that that comes into play here. I don't think anybody has argued today the evidence of heterogeneity.

This commissioner also stated that there had been some strong petroleum engineering evidence but that there "probably are errors on both sides of the equation. I think when you make assumptions even to the best of your ability, we all know what our limitations are, and I think there are limitations to both sides."

It appears to us that Moncrief places undue importance on the role of the computer simulation. The commission's order reveals that the commissioners did not rely upon the

computer simulation in making their decision. Giving due regard to the commissioners' collective expertise, we hold that substantial evidence existed in the record from which they could have reasonably found that:

There are well bore to well bore and zone to zone discontinuities, whether due to a discontinuous nature of natural fractures or the permeabilities or porosities, that do not allow production to continue from one well to another over large areas. It would not be appropriate or prudent in this situation to establish a 640–acre drilling and spacing unit for subject formations underlying subject lands.

We point out that, under § 30–5–109(d), the commission has continuing authority to increase or decrease the size of the drilling unit. Accordingly, if information is later obtained which indicates that a change in the size of the drilling unit is necessary to prevent waste and to protect correlative rights, the commission can order such a change at that point in time.

**B. Uniform Size**

Moncrief contends that the 320–acre drilling unit is not of "approximately uniform size" as required by § 30–5–109(a). We reject this argument for two reasons.

■ First, the most recently approved spacing unit is 320 acres, and that unit is positioned directly south of the drilling and spacing unit at issue in this appeal. The second reason we reject Moncrief's argument is because, although § 30–5–109(a) gives the commission the authority to "establish drilling units of specified and approximately uniform size covering any pool," this provision must be read in conjunction with other relevant provisions of the act. *Parodi v. Wyoming Department of Transportation*, 947 P.2d 1294, 1295 (Wyo.1997). Section 30–5–109(b) provides that "the acreage to be embraced within each unit and the shape thereof shall be determined by the commission from the evidence introduced at the hearing but shall not be smaller than the maximum area that can be efficiently drained by one (1) well." In addition, Wyo. Stat. Ann. § 30–5–104(d)(iv) (Michie 1997) provides that the commission has authority:

(iv) When required, in order to protect correlative rights, to establish drilling units affording each owner an opportunity to drill for and produce as a prudent operator, and so far as it is reasonably practicable to do so without waste, his just and equitable share of the oil or gas or both in the pool and to restrict or limit the production of oil or gas from any well which is allowed, after the effective date of this act, as an exception to the location requirements of or as an additional well permitted under any order of the commission establishing drilling units for a pool or part thereof or of any general well spacing rule or order adopted by the commission for conservation purposes, upon such terms and conditions as the commission may determine, upon the commission's own motion or upon application of any interested person and after notice and hearing ...

This provision, coupled with § 30–5–109(a) and (b), clearly expresses the legislative intent to bestow the commission with the power to effectuate the main purpose of the act—the prevention of waste of Wyoming's oil and gas resources. *Anschutz Corporation*, 923 P.2d at 755; *see also Big Piney Oil & Gas Company v. Wyoming Oil and Gas Conservation Commission*, 715 P.2d 557, 563 (Wyo.1986) (holding that correlative rights are always subject to the need to prevent waste). Indeed, the plain language of § 30–5–109(a) specifically predicates the requirement to establish drilling units of specified and approximately uniform size on the need to prevent waste. The commission recognized this need and, in light of the evidence on geologic characteristics of the subject formations, determined that a 320–acre drilling and spacing unit was necessary to conform with the purpose of the statute. The commission's decision was, therefore, in conformity with the governing statutes.

**C. Economic Considerations**

Moncrief contends that the high cost of the proposed well and Barrett's corporate philosophy influenced the commission. At the hearing, Chevron's attorney inquired about the specific cost of the wells during his cross-examination of the geologist:

Q. I thought you were getting pretty prolific production from these wells. I mean, what are they costing you? What do these wells cost you to drill?

A. I believe the AFEs have ranged from 5.2 up close to 7 million dollars apiece. That includes completions, I think two completions.

Moncrief's counsel brought up the subject again while he was cross-examining the geologist, who had just testified that, due to the heterogeneous nature of a particular sliver of reserves, he did not believe it would ever be drilled "because it's uneconomic":

Q. And as long as we're on that subject, approximately what is the cost, trouble free, of a well? Let's say the 5–30. What is that projected to cost?

A. As I indicated earlier, I believe the AFE is approximately 6.8 million. I would invite [Barrett's engineer] to correct me if I'm wrong.

Q. And would the same be true of the well that's proposed for the drilling unit that you're trying to create here today?

A. Yes.

Barrett's engineer later gave an estimate of $7.5 million.

■ The commissioners were aware of the specific cost of the wells because Chevron and Moncrief inquired about it and not because Barrett volunteered the information to support its request for the 320–acre drilling and spacing unit. Additionally, no reason exists for us to believe that the commission based its decision on economic rather than technical considerations. In its order, the commission did not refer to the expense associated with the drilling of this well. In fact, in response to Moncrief's counsel's reminder to the commission that its "charge is not to be a cheering section for parties wanting and willing and able to spend lots of money but, rather, to be the guardians of the conservation law," one commissioner stated:

And I certainly don't feel that this commission is cheering anyone on, but, in that same respect, the commission certainly is trying to prevent waste and wants to re-cover as much reserves as we possibly can in the state of Wyoming.

Another commissioner commented:

[T]here is definitely an argument here on what spacing is or what it should be. But I keep thinking of other areas where we deal with these same formations and have the same problems, how much does it really drain.... [T]here is conflicting testimony of whether 320–acre spacing is smaller than what can be efficiently drained. We have one side that says it isn't; we have other testimony that says it is.

.... We have to decide which side is most convincing, but we have testimony on that very issue, which I think is the issue from a waste standpoint.

.... We have to convince ourselves, is it or is it not smaller than what can be efficiently drained. And it's not that simple. I hear engineers arguing both ways. I see a lot of geology up there that shows a lot of heterogeneity.... And I have heard that argument on the Frontier time and time again and tight sands time and time again.

From these comments, it appears to us that the commissioners were primarily concerned with preventing the waste of Wyoming's oil and gas reserves. Nothing in the commission's report convinces us differently. This Court will not infer that an inappropriate basis supports the commission's findings when nothing in the findings of fact justifies us doing so. Our function is limited to determining whether the stated findings and conclusions are supported by substantial evidence. *Larsen,* 569 P.2d at 93. As our above discussion reveals, we conclude that the commission's order is supported by substantial evidence and is otherwise in accordance with law.

Affirmed.